FRANK L. SHAMBURGER AND CLADIE SHAMBURGER, DECEASED, FRANK L. SHAMBURGER, SURVIVING SPOUSE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

BOBBY F. SHAMBURGER AND BOBBYE R. SHAMBURGER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6447–70, 6448–70, 2187–71.   Filed October 23, 1973.

---

[9] See fn. 5 *supra*.

## 86

*W. Dane Clay*, for the petitioners.
*Thomas J. Miller*, for the respondent.

WILES, *Judge:* * Respondent has determined the following deficiencies in petitioners' income tax:

| Name | Year | Amount |
|---|---|---|
| Bobby F. Shamburger and Bobbye R. Shamburger, docket No. 6448–70 | 1963 | $4, 083. 63 |
| | 1964 | 34, 056. 77 |
| | 1965 | 1, 767: 93 |
| Frank L. Shamburger and Cladie Shamburger, deceased, Frank L. Shamburger, surviving spouse, docket No. 6447–70 | 1964 | 1, 715. 17 |
| Frank L. Shamburger and Cladie Shamburger, deceased, Frank L. Shamburger, surviving spouse, docket No. 2187–71 | 1963 | 23, 912. 82 |

The only issue remaining for our decision is whether petitioners realized ordinary income or long-term capital gain when they sold stock purchase warrants of Christian Universal Life Insurance Co.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

The petitioners, Bobby F. Shamburger and Bobbye R. Shamburger, are husband and wife and maintained their legal residence in North Little Rock, Ark., at the time the petition was filed in this case. They filed their Joint Federal income tax returns for 1963 and 1964 with the district director of internal revenue, Springfield, Ill. They filed their joint Federal income tax return for 1965 with the district director of internal revenue, Little Rock, Ark.

The petitioner, Frank L. Shamburger, maintained his legal residence in North Little Rock, Ark., at the time the petition was filed in this case. Frank L. Shamburger and his deceased wife Cladie Shamburger filed their joint Federal income tax return and an amended return for the year 1963 and a joint return for the year 1964 with the district director of internal revenue, Little Rock, Ark.

Petitioner Bobby F. Shamburger and petitioner Frank L. Shamburger, along with six other persons, organized Christian Universal Life Insurance Co. (hereinafter referred to as Christian Universal) in Salem, Ill., on April 5, 1961. For a number of years prior thereto Frank, Bobby's father, had been the president of a life insurance company in Arkansas; and for several years Bobby had worked for it, successively as agent, manager, state manager, and agency director.

The authorized capital stock of Christian Universal consisted of 2,500,000 shares of 20 cents par value common stock. The general

---

*Pursuant to a notice of reassignment sent to counsel for the parties, and to which no objections were filed, these cases were reassigned by the Chief Judge on Oct. 25, 1972, from Judge Craig S. Atkins to Judge Darrell D. Wiles for disposition.

understanding of the incorporators was that 2 million shares would be sold to the public at $2 per share and that no shares would be sold to the incorporators at lower prices prior to the public offering.

The incorporators of Christian Universal organized a second corporation, Trinity Investment Co., which was licensed as a broker-dealer to act as agent for the insurance company. In a prospectus dated May 4, 1961, Trinity Investment Co. offered to the public 2 million shares of the common stock of Christian Universal. The public subscribers of the 2 million shares agreed not to sell, offer for sale, or otherwise dispose of the shares for a period of at least 10 months after a certificate of authority to engage in the insurance business was issued to Christian Universal by the director of insurance of the State of Illinois. In the event of distress or unusual circumstances during the 10-month period, Christian Universal, or a security dealer designated by it, agreed to purchase back from the stockholder the stock that he purchased at the price actually paid for the stock, plus 1 percent per month for each month the shareholder retained ownership after receipt by the company of the certificate of authority. The director of insurance of the State of Illinois issued Christian Universal its certificate of authority to engage in the insurance business on or about the last part of April 1962.

The sale to the public of 2 million shares of Christian Universal stock at $2 per share was completed on or about March 31, 1962. Shortly thereafter, Trinity Investment Co. was dissolved. Another corporation, Investments Exchange, Inc., was formed for the purpose of acquiring and selling Christian Universal stock. From its formation through 1963, Investments Exchange, Inc., was the primary broker-dealer in Christian Universal stock.

On June 4, 1962, the stock rights committee of the board of directors of Christian Universal adopted a "Key Personnel and Employees' Stock Warrant and Restricted Stock Option Plan" and recommended to the board of directors that the plan be submitted to the stockholders for approval. Bobby served as chairman of the June 4, 1962, meeting. The plan provided for the grant of options to purchase 300,000 shares and the grant of warrants for 200,000 shares. The warrants were to be sold for $0.04 each or 2 percent of the fair market value of the stock as determined by the committee at the time of granting the warrants, whichever was greater. Both the options and the warrants were to be valid for a term of 4 years from the date of grant. The options and warrants entitled the holder to purchase shares for $2 each before split or the fair market value of the shares as determined by the committee at the time of grant, whichever was greater, except that the purchase price of stock covered by the options would increase

7 percent per year. The stated purpose of the plan was to provide additional incentive for employees to promote the success of the business. The options were subject to termination in the event employment was terminated. Exercise of the warrants, however, was not subject to continued employment. The options were not transferable except by will or the laws of descent and distribution. The warrants, however, were not subject to any restrictions regarding transfer or assignment. The plan was submitted to the vote of the shareholders and duly approved by them on August 9, 1962.

On October 22, 1962, the common capital stock of Christian Universal was split 4 for 1, thereby reducing par value from 20 cents to 5 cents per share.

On November 8, 1962, the stock rights committee met and provided for issuance of the options and warrants pursuant to the terms of the plan. The number of shares offered through the options and warrants reflected the split of October 22, 1962. The committee granted to Bobby options for 47,744 shares and to Frank options for 42,000 shares. It further authorized the sale to Bobby for $1,777 of warrants for 177,700 shares and the sale to Frank for $280 of warrants for 28,000 shares. As payment for the purchase price of the warrants, the committee approved the acceptance of notes payable on demand, but not later than December 31, 1963, with 7-percent interest. The issuance of stock options and stock purchase warrants in accordance with the terms of the plan was duly authorized in a permit issued by the director of insurance of the State of Illinois on November 13, 1962.

The warrants were delivered to Bobby and Frank about November 26, 1962, at which time both Bobby and Frank executed and delivered to the stock rights committee their negotiable promissory notes representing the purchase price of the warrants in the respective principal sums of $1,777 and $280, payable on demand but not later than December 31, 1963, with interest at 7 percent per annum.

The warrants granted to the named purchaser or bearer or registered owner the right to purchase shares of Christian Universal for 50 cents per share at any time within 4 years after November 21, 1962, and provided for dilution protection by appropriate adjustment in number of shares and price in the event of stock splits, stock dividends, mergers, consolidations, and other changes.

Bobby paid his promissory note with interest with one check in the sum of $200 and another in the sum of $1,691.99, which checks were presented for payment by the stock rights committee on September 17, 1963, and December 23, 1963, respectively. Frank paid his promissory note plus interest by one check in the sum of $300.41, which check was delivered to the stock rights committee on December 6, 1963, and was presented for payment on December 9, 1963.

On March 13, 1963, the director of insurance of the State of Illinois issued his permit authorizing Christian Universal to solicit subscriptions for the stock subject to the warrants.

There was no activity in the stock from the completion of the public sale on March 31, 1962, until after the 4-for-1 stock split occurred on October 22, 1962. Between that date and the date the warrants were delivered to Bobby and Frank, Investments Exchange, Inc., made two purchases of Christian Universal common stock, both under distress circumstances. On November 9, 1962, it purchased 500 shares for $2.10 per share and on November 19, 1962, it purchased 2,000 shares for $1 per share. During the same period, Investments Exchange, Inc., effected the following sales of stock, all at a price of $2.50 per share: 100 shares on November 2, 1962; 580 shares on November 9, 1962; 500 shares on November 15, 1962; 1,400 shares on November 16, 1962; 700 shares on November 20, 1962; and 100 shares on November 23, 1962.

Although neither Bobby nor Frank ever exercised any of their warrants, they did sell part of them. In 1964, Frank sold warrants to purchase 6,000 shares for $9,000. Bobby sold warrants as follows: warrants to purchase 5,300 shares for $10,406.65 in 1963; warrants to purchase 31,250 shares for $62,865 in 1964; and warrants to purchase 10,000 shares for $5,100 in 1965.

Prior to July 23, 1963, warrants of Christian Universal were not traded on any market. During the period from July 23, 1963, to the end of 1963, Investments Exchange, Inc., was the primary broker-dealer in the warrants and made acquisitions as follows: warrants to purchase 1,600 shares for $1.965 per warrant on July 23, 1963; warrants to purchase 4,000 shares for $1.75 per warrant on September 6, 1963; and warrants to purchase 2,700 shares for $1.50 per warrant on December 9, 1963.

During the period in issue, Bobby was the president and a member of the board of directors of Christian Universal. Bobby received the following amounts from Christian Universal as compensation for his services: $24,043.43 during the period May 1, 1962, through December 31, 1962; $61,524.17 in 1963; $31,778.39 in 1964; and $20,607.40 in 1965.

During the period in issue, Frank was a member of the board of directors of Christian Universal. Frank also attended and spoke at sales meetings and served as a consultant to Bobby. Frank received compensation from Christian Universal as follows: $6,159.36 during the period May 1, 1962, through December 31, 1962; $19,752.79 in 1963; $3,731.41 in 1964; and $200 in 1965. On his income tax return for 1963, Frank reported compensation of $19,752.79 from Christian Universal as employee wages, on which Federal income tax was withheld.

OPINION

The issue for decision is whether petitioners realized ordinary income or long-term capital gain when they sold stock purchase warrants of Christian Universal. Petitioners contend that they realized a long-term capital gain because they sold capital assets held for more than 6 months and because they had purchased the warrants for a fair consideration in order to maintain control of Christian Universal. The respondent contends that the warrants were granted to petitioners for reasons connected with their employment and that, therefore, pursuant to the provisions of section 1.421-6, Income Tax Regs., the petitioners realized compensation taxable as ordinary income.

Section 61 [1] provides that gross income includes compensation for services. Section 1.61-15, Income Tax Regs., provides that if any person receives an option in payment of an amount constituting compensation of such person, such option is subject to the rules contained in section 1.421-6, Income Tax Regs., for purposes of determining when income is realized in connection with such option and the amount of such income. Section 1.421-6, Income Tax Regs., provides that its rules apply only to options to which section 421 does not apply and which were granted "for any reason connected with the employment of an employee." [2] Pursuant to section 1.421-6(b)(1), Income Tax Regs., the warrants in issue are options since the term "option" is defined to include "the right or privilege of a person to purchase property from any person by virtue of an offer continuing for a stated period of time, whether or not irrevocable, to sell such property at a stated price, such person being under no obligation to purchase." The parties agree that section 421 does not apply to the present factual situation since the warrants were freely transferable at grant. The petitioner argues, however, that the warrants were not granted for any reason connected with employment but rather were granted only for the purpose of assuring that petitioners retained control of Christian Universal. Furthermore, petitioners contend that Frank was only a director and not an employee of Christian Universal.

We conclude that Frank was an employee of Christian Universal during the years in issue. Section 1.421-6(b)(2), Income Tax Regs., refers to section 3401(c) of the Code and the regulations thereunder

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise indicated.

[2] Sec. 1.421-6 Options to which section 421 does not apply.

(a) *Scope of section.* (1) If an employer or other person grants to an employee or other person for any reason connected with the employment of such employee an option to purchase stock of the employer or other property, and if section 421 is not applicable, then this section shall apply. * * * In addition, §-1.61-15 makes the rules of this section applicable in determining the time when certain other options result in the realization of income and the amount of such income.

for the rules to be applied in deciding whether an employer-employee relationship exists. Section 31.3401(c)–1, Employment Tax Regs., provides in pertinent part:

(b) Generally the relationship of employer and employee exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. * * *

* * * * * * *

(d) Whether the relationship of employer and employee exists will in doubtful cases be determined upon an examination of the particular facts of each case.

* * * * * * *

(f) All classes or grades of employees are included within the relationship of employer and employee. Thus, superintendents, managers, and other supervisory personnel are employees. Generally, an officer of a corporation is an employee of the corporation. * * * A director of a corporation in his capacity as such is not an employee of the corporation.

During the period in issue, Frank served as a director of the corporation, and in his capacity as such he was not an employee. The record establishes, however, that Frank rendered services to the company other than in his capacity as a director. He had been in the life insurance business for a long time before Christian Universal was formed, and Bobby relied on him for advice in the operation of Christian Universal. He also devoted time to the company in attending and speaking at sales meetings and in attempting to guide, develop, and inspire salesmen to greater efforts. Furthermore, on his income tax return for 1963, he reported compensation of $19,752.79 from Christian Universal as employee wages, from which Federal income tax was withheld rather than as director's fees, from which withholding would not have been required. Petitioners offered no evidence to substantiate their allegation that Frank was not an employee of Christian Universal. In view of the evidence indicating that Frank was an employee, we find that petitioners have not met their burden of proof in this regard.

Having found that both petitioners were employees of Christian Universal, we must determine whether the warrants in issue were grants for reasons connected with the petitioners' employment. Petitioners contend that the warrants were granted for the sole purpose of assuring that the incorporators could maintain control of Christian Universal. Petitioners testified that they had intended to generate public enthusiasm for Christian Universal by requiring that the promoters pay the same price for their stock as was paid by the initial public investors. The problem with this method of promoting sales

of Christian Universal stock, however, was that it precluded the incoporators from maintaining control of Christian Universal by selling stock to themselves for nominal amounts before offering the stock to the public. The petitioners further testified that the plan of selling warrants to the incorporators was devised so that the incorporators could assure their continued control of Christian Universal by exercising their warrants whenever they believed their control position was threatened.

The respondent contends that the control argument presented by the petitioners is no different from the proprietary interest argument rejected by the Supreme Court in *Commissioner* v. *LoBue*, 351 U.S. 243 (1956). In *LoBue* the Supreme Court ended the distinction between compensatory and proprietary options by deciding that a transfer of property to secure better services, whether in stock options or otherwise, results in taxable compensation. In *LoBue*, a company adopted a stock-option plan making 10,000 shares of its common stock available for distribution to key employees at $5 per share over a 3-year period. The taxpayer was notified that he would be a recipient of nontransferable stock options contingent upon his continued employment and that the amount of stock assigned to him would be based upon his "individual results." During the 3-year period, the taxpayer received stock options covering 340 shares, which options he exercised thereby incurring a profit of $8,230. The Supreme Court rejected the argument that the options were not intended as compensation but rather were designed to provide the taxpayer with a proprietary interest in the business. Holding that the taxpayer realized taxable gain when he purchased the stock, the Supreme Court said: "When assets are transferred by an employer to an employee to secure better services they are plainly compensation. * * * LoBue received a very substantial economic and financial benefit from his employer prompted by the employer's desire to get better work from him."

We conclude that the substance of the petitioners' "control" argument was rejected by the Supreme Court in *LoBue*. By granting warrants to the petitioners so that they could maintain control, Christian Universal in substance was providing an incentive to the petitioners to promote the growth of the corporation by permitting a participation in its success. If the petitioners, in their capacities as officers and directors, were able to make Christian Universal a successful insurance company, the market value of Christian Universal stock presumably would increase and the petitioners could then incur a considerable economic benefit by purchasing the stock at the lower prices provided in the warrants. This conclusion is supported by the statement in the stock-option-and-warrant plan that its purpose is to

promote additional incentive for employees to promote the success of the business. In *LoBue* the Supreme Court said that the broad coverage of what is now section 61 cannot be narrowed because of an employer's intention to enlist more efficient service from his employees by making them part proprietors of his business. Similarly, in the present case, the coverage of section 61 cannot be narrowed because of Christian Universal's intention to enlist more efficient service from the petitioners by selling to them for a nominal amount warrants that entitled them to maintain control by purchasing stock for the same price at which it was initially offered to the public. Accordingly, we conclude that section 1.421–6, Income Tax Regs., applies in determining the time when the warrants result in the realization of income and the characterization of such income.

Under section 1.421–6, Income Tax Regs., the time when income is realized because of the granting of an option is dependent on whether the fair market value of the option was readily ascertainable at the time it was granted. Respondent contends that the warrants in issue did not have a readily ascertainable fair market value when granted and that the petitioners, therefore, realized income when they sold the warrants rather than when they received them. Section 1.421–6 (c) (3) (i), Income Tax Regs., provides that where the option is not actively traded on an established market, the fair market value of such option is not readily ascertainable unless that value can be measured with reasonable accuracy, which requires that the taxpayer be able to show all of the following conditions exist:

( *a* ) The option is freely transferable by the optionee;

( *b* ) The option is exercisable immediately in full by the optionee;

( *c* ) The option or the property subject to the option is not subject to any restriction or condition (other than a lien or other condition to secure the payment of the purchase price) which has a significant effect upon the fair market value of the option or such property; and

( *d* ) The fair market value of the option privilege is readily ascertainable in accordance with subdivision (ii) of this subparagraph.

Subdivision (ii) provides that the fair market value of the option is not readily ascertainable unless the value of the option privilege can be measured with reasonable accuracy. In determining whether the value of the option privilege is readily ascertainable, subdivision (ii) requires consideration of:

( *a* ) Whether the value of the property subject to the option can be ascertained;

( *b* ) The probability of any ascertainable value of such property increasing or decreasing; and

( *c* ) The length of the period during which the option can be exercised.

Because the stock warrants in question were not actively traded on an established market, it is necessary to determine whether the value

of the warrants was readily ascertainable in accordance with the standards set forth in section 1.421–6(c)(3), Income Tax Regs. These standards are to be applied on the date the warrants were granted. We find that the warrants were granted on November 21, 1962, the day the warrants became effective and were delivered to the petitioners.

Respondent concedes that the warrants were freely transferable on the date they were granted and that neither the warrants nor the stock subject to the warrants were subject to restrictions having a significant effect on value. We, therefore, must determine whether the warrants were exercisable immediately in full by petitioners and whether the fair market value of the option privilege is readily ascertainable.

We find that the Christian Universal stock warrants, on the date of grant, were not exercisable immediately in full by petitioners. Under Illinois law, Christian Universal was prohibited from issuing any stock subject to the warrants until the director of insurance of the State of Illinois issued his permit authorizing the company to solicit subscriptions for the stock covered by the warrants. Ill. Rev. Stat. ch. 73, sec. 644 (1965). The director of insurance did not issue his permit authorizing the company to solicit subscriptions for the stock subject to the warrants until March 13, 1963. Petitioners, therefore, could not have exercised their warrants until March 13, 1963, almost 4 months after the warrants were granted.

We also find that the fair market value of the option privilege was not readily ascertainable. Petitioners did not introduce the testimony of any expert witness to show that the option privilege did have a readily ascertainable fair market value at grant. Bobby testified that the value of the stock was assumed to be the public issue price. He did not remember what factors were taken into account in measuring the value of the option privileges.

The record establishes that following the conclusion of Christian Universal's public offering in March 1962, there was no trading activity in the corporation's stock until November 1962. The trading of the stock which began in November 1962, was made under distress conditions and was insignificant in amount when compared to the corporation's total outstanding stock. The price at which the stock began selling in November 1962 did not correspond to the price for which the stock was originally offered. Thus, the public issue price was not an accurate indication of the value of the stock subject to the warrants. Accordingly, the value of the property subject to the warrants cannot be ascertained.

Having found that the warrants were not exercisable immediately in full and that the value of the option privilege was not readily ascertainable, we conclude that the warrants in issue did not have a

readily ascertainable fair market value on the date they were transferred to petitioners. Under section 1.421–6(d)(3), Income Tax Regs., if an option without a readily ascertainable fair market value is not exercised, but is transferred in an arm's-length transaction, the employee realizes compensation in the amount of the gain resulting from such transfer. Accordingly, we hold that petitioners realized compensation upon their sale of stock purchase warrants of Christian Universal.

Petitioners contend that the warrants were capital assets, the value of which was measured with reasonable accuracy, so that their gains on sales of the warrants were long-term capital gains. In support of their position, petitioners cite *Estate of Lawson Stone*, 19 T.C. 872 (1953), affd. 210 F. 2d 33 (C.A. 3, 1954), and *Colton* v. *Williams*, 209 F. Supp. 381 (N.D. Ohio 1962). Because each of these cases presented a unique factual situation, it would not be helpful to discuss these cases. We believe that each of these cases is factually distinguishable from the present case.

*Decisions will be entered under Rule 50.*