PAGEL, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 34122-85.          Filed August 8, 1988.

*John W. Lundquist,* for the petitioner.
*Gail K. Gibson* and *James K. Harris,* for the respondent.

WELLS, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax for the year ending March 31, 1982, in the amount of $195,782.54. After concessions, the remaining issue is whether petitioner realized capital

gain or ordinary income upon the sale by petitioner to its sole shareholder of a warrant to purchase stock in another corporation.

PRELIMINARY MATTER

When the instant case was reached for trial, the parties had settled all but two of the items raised in the notice of deficiency. Trial then proceeded with respect to the issues involving those two items—the characterization and timing of the income attributable to a warrant for the purchase of stock in Immuno Nuclear Corp., and a warrant for the purchase of stock in FilmTec Corp. The parties then filed simultaneous briefs and simultaneous reply briefs. In his reply brief, respondent stated that he "concedes the portion of the tax deficiency arising from the FilmTec warrant for purposes of this litigation. Respondent makes this concession without waiving its right to pursue the conceded portion through appropriate tax assessment procedures for the [year ending March 31, 1985]."

Although respondent's reply brief proffered to concede a significant portion of the deficiency for the year before us (ending March 31, 1982), petitioner filed a supplemental reply brief requesting the Court to render a decision on the merits and not to accept respondent's concession.[1] Petitioner, however, has cited no authority to support a rejection of respondent's proffered concession. Petitioner objects to respondent's offer of concession on the following grounds:

Respondent's shifting positions are prejudicial to the Petitioner. Petitioner has fully liquidated and is in the process of dissolving itself. It has retained only enough assets to pay any judgment in the pending Tax Court matter. It will not have sufficient assets to defend and pay a large judgment based upon the value of the warrant at the time of exercise.

The acceptance or rejection of a proffered concession is a matter within the discretion of the Court, and we should exercise our discretion in accordance with the "interest of justice." See *Jones v. Commissioner*, 79 T.C. 668, 673

[1]The parties' reply and supplemental briefs indicate that respondent's position with respect to the FilmTec warrant is that any income from the receipt or disposition of that warrant should be recognized in petitioner's tax year ending in 1985, not in the 1982 year herein in issue.

(1982); *McGowan v. Commissioner,* 67 T.C. 599, 607 (1976). Petitioner has not suggested how the interest of justice would compel us to reject respondent's offer of concession, and we can conceive of no injustice in allowing petitioner to prevail as to the portion of the deficiency relating to the FilmTec warrant. We therefore accept respondent's concession on that issue and shall proceed to our decision on the final item—the Immuno Nuclear Corp. warrant.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference.

During all relevant periods, petitioner was a corporation having its principal place of business in Minneapolis, Minnesota. Petitioner is a stock brokerage firm which provided the services usually offered by such firms to their clients. Petitioner's sole shareholder is Jack W. Pagel.

In September 1977, petitioner served as underwriter for a stock offering by Immuno Nuclear Corp. (Immuno). In the stock offering, 235,000 Immuno shares were sold at $1.50 per share, thus generating total proceeds of $352,500. Of that amount, Immuno received $310,200 and petitioner received $42,300 as commissions for the underwriting.

In connection with the underwriting, petitioner also received a warrant for the purchase of Immuno stock (the warrant). Petitioner paid Immuno a total of $10 for the warrant. Petitioner acquired the warrant pursuant to a clause in an underwriting agreement between Immuno and petitioner which provided that Immuno would sell to petitioner for $10 a warrant for (1) 17,000 Immuno shares, provided that petitioner sold at least 170,000 Immuno shares in the underwriting, or (2) 23,500 shares, in the event that petitioner sold all 235,000 shares made available in the offering.

The warrant provided that petitioner had the right to purchase 23,500 shares of Immuno common stock during the period beginning 13 months after October 5, 1977, the date of the warrant, and ending October 4, 1982, at the following prices per share:

If purchased after October 4, 1978,[2] and on or before October 4, 1979, at $1.605;

If purchased thereafter and on or before October 4, 1980, at $1.710;

If purchased thereafter and on or before October 4, 1981, at $1.815;

If purchased thereafter until expiration at $1.920.

Petitioner's right under the warrant to purchase the Immuno stock was not conditioned upon the future performance of any services by petitioner. Petitioner, however, could not assign, transfer, hypothecate, sell, or otherwise dispose of the warrant during the first 13 months after October 5, 1977.

When petitioner received the warrant, there was no active trading of Immuno warrants on any established market. Petitioner held the warrant in a segregated investment account from the time it acquired the warrant (October 1977) until October 1981. On October 2, 1981, petitioner sold the warrant to its sole shareholder, Mr. Pagel, for $314,900. On its Federal corporate income tax return for the year ending March 31, 1982, petitioner reported the sale of the warrant as a capital gain in the amount of $314,890 (proceeds of $314,900 and basis of $10).

In the notice of deficiency, respondent recharacterized the gain from the sale of the warrant as ordinary income, based upon the following explanations:

1i. Schedule D (Capital Gains and Losses)

Since you were the underwriter for [Immuno] and were afforded the right to purchase their stock warrants at a bargain purchase price, your sale of these stock warrants should be reported as ordinary income. Therefore, we have not allowed capital gain treatment for the $314,890 gain resulting from the sale of these stock warrants.

1j. Underwriting Income

Ordinary income was increased * * * to reflect the sale of stock warrants of [Immuno] * * * . You were the underwriters * * * , and were afforded the right to purchase their stock warrents [sic] at a bargain purchase price. Therefore, you should recognize ordinary income at the time of exercise or transfer of the option in the amount of the difference between the fair market value and the exercise price.

---

[2]Although the warrant sets an exercise price as of Oct. 5, 1978, other provisions in the warrant preclude petitioner from exercising the warrant until Nov. 5, 1978, 13 months after the date of the warrant.

OPINION

The issue is whether petitioner's gain from the sale of the warrant to Mr. Pagel is taxable as ordinary income or as capital gain. Respondent asserts that section 83[3] governs the resolution of this case. He argues that, under section 83 and section 1.83-7, Income Tax Regs., $314,890 ($314,900 proceeds from petitioner's sale of the warrant to Mr. Pagel, less $10 cost) is taxable as ordinary income in petitioner's 1982 tax year as compensation received by virtue of the underwriting services provided to Immuno by petitioner in 1977.

Petitioner contends that respondent did not raise the applicability of section 83 until after the completion of trial and, therefore, "All references to section 83 should be stricken on account of the Respondent's failure to raise the issue." Petitioner also makes the following alternate arguments to support the proposition that section 83 does not cause the gain from the sale of the warrant to be taxable as ordinary income: (1) There was no compensatory element in petitioner's receipt of the warrant; (2) any compensation element should be determined only at petitioner's receipt of the warrant, not at the sale of the warrant, because the warrant was transferrable and had a readily ascertainable fair market value; and (3) section 1.83-7, Income Tax Regs., is either inapplicable to the warrant or is an invalid regulation.

### Section 83 Regulations Discussed and Applied to the Warrant

We shall begin our analysis with an exegesis of the general provisions of section 83. We then shall examine those provisions in conjunction with the facts of the instant case so that we may decide whether respondent adequately notified petitioner of the issue of the applicability of section 83. Section 83(a) generally provides that where property is transferred in connection with the performance of past, present, or future services, the excess of the fair market

---

[3]Unless otherwise indicated, all Code and section references are to the Internal Revenue Code of 1954 as amended and in effect during the relevant year. All Rule references are to the Tax Court Rules of Practice and Procedure.

value of the property over the amount paid for the property is includable as compensation in the gross income of the taxpayer who performed the services. *Bagley v. Commissioner,* 85 T.C. 663, 669 (1985), affd. per curiam 806 F.2d 169 (8th Cir. 1986). Section 83 does not apply only to employees of the transferor of the property; rather, it is applicable to any person other than the one for whom the services were performed, including independent contractors of the transferor. *Cohn v. Commissioner,* 73 T.C. 443, 446 (1979).[4] Thus, even though petitioner's relationship to Immuno was that of an independent contractor rather than an employee, section 83 may apply to the receipt or disposition of the warrant by petitioner if the other requirements of that section are met.

Section 1.83-7 of the Income Tax Regulations sets forth rules for determining the treatment in the case of a taxpayer who receives a nonqualified stock option[5] in connection with the performance of services. Section 1.83-8(b)(1), Income Tax Regs., provides that the regulations under section 83, including regulations section 1.83-7, are applicable to property transferred after June 30, 1969. Petitioner has not suggested that the warrant is not an "option" as contemplated in section 83; indeed, we have no doubt that the term "option" as used in section 83 and the regulations thereunder includes warrants such as the one from Immuno herein at issue. See *Shamburger v. Commissioner,* 61 T.C. 85, 90 (1973), affd. per curiam 508 F.2d 883 (8th Cir. 1975).

We also have no doubt that petitioner received the warrant in connection with the underwriting services performed by it for Immuno; the parties in fact stipulated to that fact. Immuno certainly would not have issued the warrant to petitioner but for the performance of the underwriting services. The fact that petitioner was not obligated to perform any future services for Immuno is immaterial in determining whether section 83 applies.[6]

---

[4] See also *Cassetta v. Commissioner,* T.C. Memo. 1979-385.

[5] A "nonqualified stock option" is defined as one to which sec. 421 does not apply. Sec. 1.83-7(a), Income Tax Regs. Neither party has suggested that petitioner's warrant is an option to which sec. 421 applies, and we find that sec. 421 is inapplicable to the warrant.

[6] The obligation of a taxpayer to perform future services may affect when, not whether, sec. 83 applies to a transfer of property. See sec. 1.83-3(a), (b), and (f), Income Tax Regs.

Section 83(a) only requires that property be transferred "in connection with the performance of services," and the transfer of the warrant fits within that categorization.

Petitioner argues, however, that the fair market value of the warrant at the date of its transfer to petitioner was no greater than the $10 purchase price of the warrant, so the receipt of the warrant involved no compensation element to which section 83 may attach. We cannot agree with that characterization of the facts. Petitioner had an option to purchase 23,500 Immuno shares within the 2 years after the public issuance of the Immuno stock at a price only 7 percent greater than the $1.50 price at which the shares were sold in the fully subscribed offering. The warrant also provided petitioner the opportunity to purchase Immuno stock for 5 years at prices no more than 28 percent greater than the public offering price. On first blush then, it appears to us that the $10 purchase price for the warrant was nominal under any measurement, even taking into account the temporal restrictions placed on petitioner's exercise of the warrant. See *Weigl v. Commissioner,* 84 T.C. 1192, 1208 (1985).

Extending past our preliminary conclusions, however, we note that several formulae have been developed by economists and other financial authors to value warrants. See Gann, "Taxation of Stock Rights and Other Options: Another Look at the Persistence of *Palmer v. Commissioner,*" 1979 Duke L.J. 911, 945 n. 86. "One of the most accurate [of those formulae] is one developed by Sheen Kassouf," a simplified version of which may be used to approximate the normal value of a long-lived (more than 3 years), speculative warrant, such as the warrant.[7] Levine, "Financial Analyst's Handbook 1: Methods, Theory, and Portfolio Management," 470 (1975). In mathematical terms, the simplified Kassouf formula provides that if "S" is the stock price and "E" is the exercise price of the warrant, the normal value of the warrant is given by $\sqrt{E^2 + S^2} - E$. Levine, *supra* at 470; Pomeroy, "The Metamorphosis of the Nonqualified Stock Option Under the Tax Reform Act of

---

[7]Respondent's expert witness applied the complex Kassouf formula, as well as one known as the "Black-Scholes model," and took an average of the two results to determine a value for the FilmTec warrant.

1976—The Strange Case of the Disappearing Loophole," 54 Taxes 761, 769 (1976). To apply that formula to the warrant, we shall assume that the stock price is $1.50 per share (the price at which the shares were sold in the public offering) and that the exercise price of the warrant is $1.92 per share (the highest exercise price of those provided in the warrant and thus the exercise price which would give rise to the lowest warrant price per share). Thus, under the simplified Kassouf formula, the warrant's value per share equals $\sqrt{(1.5)^2 + (1.92)^2} - 1.92$, or approximately 51.65 cents per share. The warrant provides a right to purchase 23,500 shares, so its normal value is $12,138 under the simplified Kassouf formula.

We realize that the Kassouf formula does not take into account the temporal restrictions or the fact that the exercise prices are lower than $1.92 in earlier years, and we are not satisfied that the warrant necessarily was worth approximately $12,000 at the time of grant.[8] For example, we note Mr. Pagel's testimony that the warrant had some speculative value at the time it was granted to petitioner. Mr. Pagel stated that the restrictions associated with the warrant would have caused the speculative value of the warrant in 1977 to be no more than 20 percent of the price of the underlying stock. Twenty percent of the value of the underlying Immuno stock in 1977 equals $7,050 (23,500 × $1.50 per share × 20%), a value over 40 percent less than that given by the Kassouf formula.

Mr. Pagel's use of the 20-percent rule-of-thumb estimate is consistent with regulations of the Minnesota Department of Commerce governing the maximum commissions any underwriter may receive for underwriting services. Those regulations provide that if "no market value exists [for an option or warrant], an option or warrant to acquire common stock *shall* be valued at 20 percent of the public offering price of such number of shares under option or warrant."

---

[8] We used an exercise price of $1.92, instead of the lower potential exercise prices, in order to give petitioner the benefit of the doubt and a lower valuation.

Using the complex Kassouf formula, set forth in Levine, *supra* at 470, we also performed several calculations based upon the minimum exercise price ($1.605) and the maximum exercise price ($1.92), as well as upon several assumptions we made about the dividend rate and previous 11 months' stock prices for Immuno stock. Based upon those different assumptions, the values we calculated for the warrant ranged from approximately $8,900 to approximately $15,200.

(Emphasis supplied.) Minn. R. 2875.3050, subpar. 2 (1983). Arguably, the 20-percent rule used by Mr. Pagel and the Minnesota regulations may be more accurate than the Kassouf formula in the case of a newly granted warrant still subject to restrictions imposed by State or Federal securities law, e.g., nontransferability for 1 year past the offering date (see Minn. R. 2875.3030C (1983)). Regardless of which method of valuation is more accurate, the Kassouf formula, the Minnesota regulations, or Mr. Pagel's estimate, we are convinced that any of these methods support our preliminary conclusion that the value of the warrant when acquired by petitioner was far in excess of the nominal $10 sum paid by petitioner. Accordingly, we reject petitioner's argument and find that the fair market value of the warrant was greater than the $10 paid by petitioner and that there was an element of compensation inherent in the grant of the warrant.

Section 1.83-7(a), Income Tax Regs., provides that a taxpayer realizes compensation income under the general rule of section 83(a) if the fair market value of the option is readily ascertainable at the time the option is granted. If, however, the option's fair market value is *not* readily ascertainable at the time of grant, the taxpayer realizes compensation income only when the option is exercised or otherwise disposed of in an arm's-length transaction. Sec. 1.83-7(a), Income Tax Regs. The regulation deems an option to have a readily ascertainable fair market value if the option is actively traded on an established market. Sec. 1.83-7(b)(1), Income Tax Regs. If an option is not actively traded on an established market, section 1.83-7(b)(2), Income Tax Regs., provides that the option is not considered to have a readily ascertainable fair market value at time of grant unless four conditions exist:

(i) The option is transferable by the optionee;

(ii) The option is exercisable immediately in full by the optionee;

(iii) The option or the property subject to the option is not subject to any restriction or condition (other than a lien or other condition to secure the payment of the purchase price) which has a significant effect upon the fair market value of the option; and

(iv) The fair market value of the option privilege is readily ascertainable in accordance with [section 1.83-7(b)(3), Income Tax Regs.[9]]

The terms of the warrant are such that, until 13 months after the grant of the warrant, petitioner could not exercise the right to purchase Immuno stock and could not assign, transfer, hypothecate, sell, or otherwise dispose of the warrant. Nevertheless, petitioner's reply brief cites to *Robinson v. Commissioner,* 82 T.C. 444 (1984), for the proposition that the warrant was transferable upon receipt. Petitioner's reply brief fails to mention, however, that the First Circuit reversed our holding in *Robinson* that the stock at issue was transferable. See *Robinson v. Commissioner,* 805 F.2d 38, 42 (1st Cir. 1986). Also, the issue in *Robinson* was whether stock acquired through the exercise of a stock option was transferable where the taxpayer's option agreement with the issuer corporation provided that the corporation had a first right of first refusal before the stock could be sold. There was no issue concerning the transferability of any option, and *Robinson* is inapposite to the instant case.

Petitioner's reply brief also cites section 83(c)(2) for the proposition that property is transferable if it is "not subject to a substantial risk of forfeiture." We read section 83(c)(2) only to say that a substantial risk of forfeiture prevents a property interest from being transferable for purposes of section 83; section 83(c)(2) does not provide that a property interest without a substantial risk of forfeiture necessarily is transferable for purposes of section 83. See also sec. 1.83-3(d), Income Tax Regs. Based upon the plain language of the terms of the warrant, we thus hold that the warrant was not transferable when petitioner received it. Pursuant to section 1.83-7(b)(1) and (2)(i) and (ii), Income Tax Regs., the warrant therefore did not have a readily ascertainable

---

[9]Sec. 1.83-7(b)(3), Income Tax Regs., provides that in the determination of whether the value of an option is readily ascertainable, one must consider whether the value of the option may be measured with reasonable accuracy. That paragraph also provides that if an option has a readily ascertainable value, the amount of that value is to be determined by considering:

(i)   Whether the value of the property subject to the option can be ascertained;
(ii)  The possibility of any ascertainable value of such property increasing or decreasing; and
(iii) The length of the period during which the option can be exercised.

By virtue of our holdings below, we need not further analyze sec. 1.83-7(b)(3), Income Tax Regs.

fair market value at the time it was granted because (1) there was no active trading of the warrant on an established market, and (2) the warrant was neither transferable nor exercisable by petitioner until 13 months after the date it was granted. In short, under the provisions of section 1.83-7, Income Tax Regs., section 83 unquestionably did not apply to petitioner's receipt of the warrant at the time the warrant was granted.

Furthermore, that regulation would require petitioner to recognize compensation income at the time of the warrant's exercise or other disposition in an arm's-length transaction. Sec. 1.83-7(a), Income Tax Regs. The price at which petitioner transferred the warrant to Mr. Pagel, $314,900, was selected by petitioner and Mr. Pagel "with some counsel from our attorneys." Although the transaction was between petitioner and its sole shareholder, neither petitioner nor respondent has suggested that the sales price of $314,900 was other than the fair market value of the warrant or that the sale of the warrant was other than an arm's-length transaction. We therefore find that petitioner's sale of the warrant to Mr. Pagel in October 1981 was an arm's-length transaction executed at the fair market value of the warrant, $314,900. See *H.B. Zachary Co. v. Commissioner,* 49 T.C. 73, 81 (1967). Thus, the terms of the regulation would require recognition of compensation income to petitioner during petitioner's taxable year ending in 1982. Sec. 1.83-7(a), Income Tax Regs. The notice of deficiency provides such treatment for the warrant, and we are constrained to sustain that determination if we hold section 1.83-7, Income Tax Regs., to be applicable to petitioner in the instant case.

## *Whether Section 83 Is Properly Before the Court*

We now turn to deciding whether section 83 is properly at issue in the instant case. Insofar as we can discern from the record, section 83 was not specifically mentioned in the notice of deficiency, the pleadings, the trial memoranda, or the trial. Petitioner asserts that the potential applicability of section 83 to the facts of the instant case "was raised for the first time when the Respondent sought an extension of time in which to file its brief." Indeed, no specific Code

sections were mentioned in the notice of deficiency in regard to the warrant, and the only statutory reference in respondent's trial memorandum with respect to the warrant is to section 1236.[10] Respondent's reference to section 1236, however, appears to be in the nature of a rebuttal to petitioner and not a reliance on that section by respondent. Respondent's trial memorandum asserts only that the unavailability of capital gains treatment is in accordance with section 1236; it does not assert that section 1236 mandates ordinary income treatment. We agree with the statement in respondent's brief that section 1236 "does not, by itself, dictate capital gains treatment for dealers who comply with its terms." The notice of deficiency and respondent's trial memorandum, however, both set forth factual allegations sufficient to indicate the applicability of section 83 to the warrant: (1) Petitioner was the underwriter for Immuno; (2) petitioner received the warrant as a result of the underwriting; and (3) the income from the warrant should be recognized as ordinary income, not as a capital gain, during the 1982 year.

It is well established that a party may rely upon a theory if the opposing party has been provided with fair warning of the intention to base an argument upon that theory. *William Bryen Co. v. Commissioner*, 89 T.C. 689, 707 (1987); *Leahy v. Commissioner*, 87 T.C. 56, 64 (1986); *Schuster's Express, Inc. v. Commissioner*, 66 T.C. 588, 593 (1976), affd. per curiam 562 F.2d 39 (2d Cir. 1977); *Rubin v. Commissioner*, 56 T.C. 1155, 1163 (1971), affd. 460 F.2d 1216 (2d Cir. 1972). "Fair warning" means that respondent's failure

---

[10]As in effect during the year in issue, sec. 1236 provided as follows:

SEC. 1236. DEALERS IN SECURITIES.

(a) CAPITAL GAINS.—Gain by a dealer in securities from the sale or exchange of any security shall in no event be considered as gain from the sale or exchange of a capital asset unless—
    (1) the security was, before the close of the day on which it was acquired (before the close of the following day in the case of an acquisition before January 1, 1982), clearly identified in the dealer's records as a security held for investment or if acquired before October 20, 1951, was so identified before November 20, 1951; and
    (2) the security was not, at any time after the close of such day, held by such dealer primarily for sale to customers in the ordinary course of his trade or business.

        \*      \*      \*      \*      \*      \*      \*

(c) DEFINITION OF SECURITY.—For purposes of this section, the term "security" means any share of stock in any corporation, certificate of stock or interest in any corporation, note, bond, debenture, or evidence of indebtedness, or any evidence of an interest in or right to subscribe to or purchase any of the foregoing.

to give notice, in the notice of deficiency or in the pleadings, of his intention to rely on a particular theory did not prejudice the taxpayer's ability to prepare its case. *William Bryen Co. v. Commissioner,* 89 T.C. at 707. Of key importance in evaluating the existence of prejudice is the amount of surprise and the need for additional evidence on behalf of the party opposed to the new position. *Leahy v. Commissioner,* 87 T.C. at 64.

In the instant case, all evidence necessary for a legal determination under the section 83 regulations is contained in the record. Petitioner thus was not prejudiced whatsoever with regard to any evidence; no additional evidence would have changed the status of the warrant under section 1.83-7, Income Tax Regs. We also do not believe that petitioner was unfairly surprised by respondent's assertion of section 83. Although petitioner's briefs dispute whether section 83 is properly before the Court, several pages in petitioner's opening brief and the bulk of its reply brief are devoted to substantive legal analysis regarding section 83. That indicates to us that petitioner had adequate notice of the section 83 issue and adequate opportunity to make its legal arguments on the issue, especially since all facts necessary to determine proper treatment under the section 83 regulations are not reasonably disputable.

Moreover, as we noted above, the language in the notice of deficiency set forth the underlying rationale for attachment of the principles of section 83 to the gain from the sale of the warrant. Nothing in respondent's notice of deficiency, answer, trial memorandum, or trial presentation set forth any position inconsistent with taxation of the gain from the sale of the warrant under section 83. This is not a situation where respondent issued a narrowly drawn notice of deficiency and subsequently advanced new grounds not directly or implicitly within the ambit of the determination in the notice of deficiency. See *Sorin v. Commissioner,* 29 T.C. 959, 969 (1958), affd. per curiam 271 F.2d 741 (2d Cir. 1959); *Weaver v. Commissioner,* 25 T.C. 1067, 1085 (1956).[11] Rather, respondent simply narrowed the issue after his initial determination in the broadly worded notice of defi-

---

[11]See also *Big "D" Development Corp. v. Commissioner,* T.C. Memo. 1971-148, affd. per curiam 453 F.2d 1365 (5th Cir. 1972).

ciency. In such a situation, the issue is properly before the Court, and we so hold. See *Mills v. Commissioner,* 399 F.2d 744, 748 (4th Cir. 1968), affg. a Memorandum Opinion of this Court; *William Bryen Co. v. Commissioner, supra; Sorin v. Commissioner, supra.*

We note also that in circumstances such as those herein, there is often an assertion that respondent has the burden of proof because he has alleged a "new matter." In the instant case, however, petitioner has not suggested that respondent should have the burden of proof with respect to section 83. Even if petitioner had made such an assertion, we feel that the burden of proof herein is a moot issue. As we stated above, all *facts* relevant to any determination under the provisions of the section 83 regulations are in our mind unambiguous; the only question is the appropriate law to apply to those facts.

### *Retroactivity of Section 1.83-7, Income Tax Regs.*

Having determined that section 83 is properly at issue in the instant case and that section 1.83-7, Income Tax Regs., supports respondent's position herein, we turn to petitioner's remaining arguments.

Petitioner argues that section 1.83-7, Income Tax Regs., is inapplicable to the gain from the sale of the warrant because that regulation was not issued in final form until July 21, 1978, several months after the grant of the warrant to petitioner. See T.D. 7554, 1978-2 C.B. 71, 93. We reject petitioner's argument. First, section 1.83-8(b)(1), Income Tax Regs., specifically provides that section 83 and the regulations thereunder apply in general to property transferred after June 30, 1969.[12] Thus, the regulations by their own terms apply to property transferred at the time that petitioner was granted the warrant in 1977. Second, regulations generally are presumed to be retroactively effective, and the Commissioner has broad discretion to apply regulations retroactively. *Automobile Club of Michigan v. Commissioner,* 353 U.S. 180, 184 (1957); *Likins-Foster Honolulu*

---

[12]Sec. 1.83-8(b)(3), Income Tax Regs., provides that sec. 83 shall not apply to property received upon the exercise of an option granted before Apr. 22, 1969. That paragraph apparently is inapplicable to the warrant because petitioner never exercised the warrant (but see secs. 1.83-7(a) and 1.83-8(b)(3), Income Tax Regs.). In any event, the difference between the two effective dates is immaterial to the resolution of the instant case.

*Corp. v. Commissioner,* 840 F.2d 642, 647 (9th Cir. 1988), affg. a Memorandum Opinion of this Court; *Wilson v. United States,* 588 F.2d 1168, 1171 and cases cited in n. 11 (6th Cir. 1978); *Kahler Corp. v. Commissioner,* 486 F.2d 1, 5 (8th Cir. 1973), revg. and remanding on other grounds 58 T.C. 496 (1972); *Sherwood Properties, Inc. v. Commissioner,* 89 T.C. 651, 665 (1987). See also sec. 7805(b); Note, "The Retroactivity of Treasury Regulations: Paths to Finding Abuse of Discretion," 7 Va. Tax Rev. 509 (1988).

We see no abuse of that discretion in the retroactive application of the section 83 regulations to property transferred after June 30, 1969. Indeed, the effective date of the section 83 regulations comports with the effective date of section 83, which applies to taxable years ending after June 30, 1969. See Pub. L. 91-172, sec. 321(a), 83 Stat. 487, 591. We note also that in 1971, well before the grant of the warrant, proposed regulations under section 83 were released which included provisions substantially identical to the relevant provisions of section 1.83-7 in final form. See 36 Fed. Reg. 10794 (1971). There thus was public notice of the proposed administrative position well before petitioner received the warrant, and petitioner certainly cannot argue that it relied upon that proposed position to its detriment. Under such circumstances, the retroactive application of section 1.83-7, Income Tax Regs., to the warrant is not an abuse of authority. *Peach v. Commissioner,* 84 T.C. 1312, 1318 (1985), affd. without published opinion 805 F.2d 393 (4th Cir. 1986); *Wendland v. Commissioner,* 79 T.C. 355, 382 (1982), affd. per curiam 739 F.2d 580 (11th Cir. 1984), affd. sub nom. *Redhouse v. Commissioner,* 728 F.2d 1249 (9th Cir. 1984).

### *Validity of Section 1.83-7, Income Tax Regs.*

We turn finally to what, in our view, is the only genuine issue in the instant case. We view petitioner's remaining contentions as being intertwined and, thus, we shall discuss the validity of regulation section 1.83-7 in conjunction with whether the warrant had a readily ascertainable fair market value for purposes of section 83. Before we begin our analysis of the regulation's validity, we pause to note that petitioner has not asserted that the regulation is invalid

with regard to the warrant, much less offered an analysis on the point. Petitioner rested its contentions of the inapplicability of section 1.83-7, Income Tax Regs., to the warrant only on the one-sentence statement that the regulation was not promulgated in final form until subsequent to the grant of the warrant to petitioner. We discussed above the error in that position. Petitioner, however, did assert that the regulation contradicted the statute in regard to the warrant for Filmtec stock, and petitioner's reply brief includes a short discussion of that issue.

Petitioner's final contention basically is that if any ordinary income must be recognized on account of the warrant, that ordinary income is recognizable upon the grant of the warrant in 1977, not upon the sale of the warrant to Mr. Pagel in 1981. In support of its case, petitioner notes that the amount which respondent proposes to tax to petitioner as ordinary income from the sale of the warrant—$314,890—is greater than the $310,200 received by Immuno from the 1977 stock offering. Petitioner argues that it is an "absurd and illegal proposition" for it to be taxed on compensation income[13] significantly greater in amount than the total proceeds of the stock offering to Immuno. While we do not agree that the proposition is illegal, we do agree that the application of section 1.83-7, Income Tax Regs., to the gain from the sale of the warrant produces a seemingly anomalous result. Even though such a result appears incongruous, however, we must analyze the law of section 83 and the underlying policy in order to reach a decision.

Section 1.83-7, Income Tax Regs., was promulgated to provide guidance in determining which options have a readily ascertainable fair market value and, thus, are subject to section 83. Transfers of options without a readily ascertainable fair market value are, by the terms of Code section 83(e)(3), not subject to section 83. The phrase "readily ascertainable fair market value," as applied to options, finds its genesis in a 1956 Supreme Court case, *Commissioner v. LoBue*, 351 U.S. 243 (1956). In what

---

[13]Petitioner notes that respondent's position in this case would result in petitioner's recognizing $357,190 of ordinary compensation income on account of the underwriting ($314,890 net gain on the warrant plus $42,300 cash received at the time of the underwriting).

arguably might have been dicta, the Supreme Court stated, "It is of course possible for the recipient of a stock option to realize an immediate taxable gain. See [*Commissioner v. Smith,* 324 U.S. 177, 181-182 (1945)]. The option might have a *readily ascertainable market value* and the recipient might be free to sell his option." (Emphasis added.) 351 U.S. at 249.

In 1961, the Treasury Department embraced the "readily ascertainable" standard with the promulgation of section 1.421-6(c), Income Tax Regs.[14] See T.D. 6540, 1961-1 C.B. 161. As they were promulgated in 1961 and currently exist, the provisions in section 1.421-6(c), Income Tax Regs., that define whether an option has a readily ascertainable value are substantially identical to those in current section 1.83-7(b), Income Tax Regs. The only material difference in wording between the two regulation subsections is that section 1.421-6(c) only contemplates the receipt by employees of options in connection with their employment, whereas section 1.83-7 contemplates the receipt by both employees and independent contractors of options in connection with the performance of services. Also, as a practical matter, section 421 and the regulations thereunder never applied to "nonqualified stock options" such as the warrant (see note

---

[14](c) *Options with a readily ascertainable fair market value.*—(1) If there is granted an option to which this section applies and which has a readily ascertainable fair market value (determined in accordance with subparagraphs (2) and (3) of this paragraph) at the time the option is granted, the employee in connection with whose employment such option is granted realizes compensation at such time in an amount equal to the excess, if any, of such fair market value over any amount paid for the option. If an option to which this section applies does not have a readily ascertainable fair market value at the time the option is granted, the time when the compensation is realized and the amount of such compensation shall be determined under paragraph (d) of this section.

(2) Although options may have a value at the time they are granted, that value is ordinarily not readily ascertainable unless the option is actively traded on an established market. If an option is actively traded on an established market, the fair market value of such option is readily ascertainable for purposes of this section by applying the rules of valuation set forth in section 20.2031-2 of this chapter (the Estate Tax Regulations).

(3)(i) When an option is not actively traded on an established market, the fair market value of the option is not readily ascertainable unless the fair market value of the option can be measured with reasonable accuracy. For purposes of this section, if an option is not actively traded on an established market, the option does not have a readily ascertainable fair market value when granted unless the taxpayer can show that all of the following conditions exist:

(a) The option is freely transferable by the optionee;

(b) The option is exercisable immediately in full by the optionee;

(c) The option or the property subject to the option is not subject to any restriction or condition (other than a lien or other condition to secure the payment of the purchase price) which has a significant effect upon the fair market value of the option or such property; and

(d) The fair market value of the option privilege is readily ascertainable in accordance with subdivision (ii) of the subparagraph.

5 *supra*); however, section 1.61-15, Income Tax Regs., which was promulgated in final form in 1963 by T.D. 6696, 1963-2 C.B. 61, incorporates and applies the provisions of section 1.421-6, Income Tax Regs., to determine the treatment for tax purposes of nonqualified stock options received as payment of income by any person, including an independent contractor. T.D. 6696 also amended section 1.421-6(b), Income Tax Regs., by adding a paragraph that makes a specific reference to the rules of regulation sections 1.61-15 and 1.421-6 applying to a stock option granted to an underwriter for a public offering where the option grant "is expressly or impliedly conditional upon the successful completion of the underwriting." See sec. 1.421-6(b)(3)(ii), Income Tax Regs.

Thus, when Congress enacted section 83 in 1969, the regulatory treatment of stock options received by independent contractors for the performance of underwriting services was identical to that of current regulations section 1.83-7, at least insofar as the facts of the instant case are concerned. In fact, the regulatory scheme is such that the provisions of sections 1.61-15 and 1.421-6, Income Tax Regs., govern property transferred on or before June 30, 1969, and the identical rules of section 1.83-7, Income Tax Regs., apply if the property was transferred after June 30, 1969.[15] See secs. 1.61-2(d)(6)(i) and 1.83-8(b), Income Tax

---

[15]The unmistakable intention of the regulatory scheme is that sec. 1.83-7, Income Tax Regs., applies to post-1969 nonqualified options such as the warrant; however, it appears to us that a technical reading of the regulations would result in the facts of the instant case not being subject to any regulation provision. The terms of sec. 83(e)(3) state that sec. 83 does not apply to the transfer of an option without a readily ascertainable value, and sec. 83(a), by its terms, applies only to a transfer of property in connection with the performance of services. It thus appears to us that an option without a readily ascertainable value at the time it was transferred by the recipient of services is not subject to taxation under sec. 83 and, thus, the sec. 83 regulations do not appear to provide the authority to tax the performer of the services. By default, sec. 61 therefore should control taxation of the property. Secs. 1.61-15(a) and 1.61-2(d)(1) and (6), Income Tax Regs., provide several exceptions and cross-references to the sec. 83 regulations; however, we are unable to find any provision in the sec. 61 regulations that applies to a post-1969 option without a readily ascertainable value to make it taxable under the sec. 61 regulations or any incorporation by reference of the scheme of sec. 1.83-7, Income Tax Regs.

We nevertheless believe that the regulatory scheme is intended to apply to options taxable under both sec. 83 and sec. 61. We thus shall apply the scheme of the sec. 83 regulations as if it technically applied to options which fell out of the provisions of sec. 83 into those of sec. 61. Even lacking such a regulatory scheme, we would reach the same conclusion as provided by that scheme pursuant to the relevant case law that otherwise exists. See p. 221, *infra.*

We also note that although this issue may not have been squarely before the Court, the Eighth Circuit, the Court to which the instant case is appealable, affirmed the application of

Regs. In short, the provisions of section 1.83-7, Income Tax Regs., only reestablish for post-1969 years the regulatory treatment of property like the warrant.

We upheld the validity of sections 1.61-15 and 1.421-6, Income Tax Regs., as applied to pre-1969 grants of warrants to underwriters in *Weigl v. Commissioner*, 84 T.C. at 1212-1218—a Court-reviewed case where the relevant facts were not materially distinguishable from those of the instant case. If it were not for the enactment of section 83, *Weigl* would control our decision in the instant case and our analysis would be complete. We must examine, however, whether Congress' enactment of section 83 served to invalidate the operative regulatory provisions which theretofore were valid.

We begin by noting that we easily might have concluded that the warrant had a readily ascertainable fair market value at the date it was granted, and we might have made a finding of the warrant's value. We already have discussed the Kassouf formula, a generally well-respected method for approximating the normal value of a warrant without regard to whether the warrant is publicly traded. We have cited to a law review footnote which referred to several authors who have developed models for the valuation of stock options and warrants. See Gann, *supra* at 945 n. 86. We even noted a State regulatory provision that provided a deemed value for an option or warrant. We would not think it too unwieldy for one or more of those methods to be adopted as constructs whereby nonpublicly traded options and warrants could be found to have readily ascertainable values.

Our role in the constitutional scheme, however, is not to draft the law; it is solely to interpret it. Indeed, we are constrained to uphold a regulation if it has a reasonable basis in the statutory history, even though a taxpayer's challenge to the policy behind the regulation has logical force. *National Muffler Dealers Association, Inc. v. United States*, 440 U.S. 472, 488 (1979); *Fulman v. United States*, 434 U.S. 528, 530 (1978). "Congress has delegated to the Commissioner, not to the courts, the task of prescribing all

this regulatory scheme to a post-June 30, 1969, year in *Bagley v. Commissioner*, 806 F.2d 169 (8th Cir. 1986), affg. 85 T.C. 663 (1985).

needful rules and regulations for the enforcement of the Internal Revenue Code. 26 U.S.C. section 7805(a)." *Bingler v. Johnson,* 394 U.S. 741, 750-751 (1969); *United States v. Correll,* 389 U.S. 299, 307 (1967). See also *National Muffler Dealers Association, Inc. v. Commissioner,* 440 U.S. at 488; *Weigl v. Commissioner,* 84 T.C. at 1214. Treasury regulations are not to be rejected unless they are unreasonable and plainly inconsistent with the statute, and they should not be overruled except for weighty reasons.[16] *Bingler v. Johnson,* 394 U.S. at 750; *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 501 (1948); *Weigl v. Commissioner,* 84 T.C. at 1213-1214.

The Code states only that section 83 "shall not apply to * * * the transfer of an option without a readily ascertainable fair market value." Sec. 83(e)(3). The legislative histories that accompany the enactment of section 83 provide no elaboration whatsoever on that provision. See H. Rept. 91-413, 1969-3 C.B. 200, 255, 377; S. Rept. 91-552, 1969-3 C.B. 423, 501; H. Rept. 91-782 (Conf.), 1969-3 C.B. 644, 659-660. Part 2 of the House report, however, is a "Technical Explanation of the Bill." See 1969-3 C.B. at 340. The Technical Explanation's discussion of the provision which ultimately was enacted as section 83 includes at least two references to "existing regulations." 1969-3 C.B. at 376. Those references indicate, to us at least, that Congress likely was aware of the then-existing regulations with respect to the transfer of property in connection with the performance of services. Sections 1.61-15 and 1.421-6 were two such regulations.

Congress did not specify any changes from the regulations' treatment of whether an option transferred in connection with the performance of services had a "readily ascertainable fair market value," when it had a clear opportunity to do so. Arguably, Congress' silence in that regard may amount to a legislative enactment of the regulation provisions regarding whether options have a readily ascertainable fair market value. See *Helvering v. R.J. Reynolds Tobacco Co.,* 306 U.S. 110, 115-116 (1939); 1 J. Mertens, Law of Federal Income Taxation, sec. 3.22 (1982

---

[16] A holding that the regulation is invalid would upset a regulatory scheme for the taxation of options that has been in effect for 25 years, since the release of T.D. 6696 in late 1963.

rev.). In any event, Congress has not enacted any statute that contradicts the provisions of regulation sections 1.61-15 and 1.421-6, or regulations section 1.83-7, in the 25 years since such provisions first were enacted. In 1976, subsequent to the enactment of section 83 and the release of the proposed section 83 regulations, but before the promulgation in final form of section 1.83-7, Income Tax Regs., Congress amended section 422 as applicable to qualified stock options granted to employees. The Conference report that accompanies that legislation, H. Rept. 94-1515 (Conf.), to accompany H.R. 10612 (Pub. L. 94-455), 438-439 (1976), included the following statement:

The conferees intend that in applying these rules for the future, the Service will make every reasonable effort to determine a fair market value for an option (i.e., in cases where similar property would be valued for estate tax purposes) where the employee irrevocably elects (by reporting the option as income on his tax return or in some other manner to be specified in regulations) to have the option valued at the time it is granted (particularly in the case of an option granted for a new business venture). The conferees intend that the Service will promulgate regulations and rulings setting forth as specifically as possible the criteria which will be weighed in valuing an option which the employee elects to value at the time it is granted.

Commentators have suggested that Congress' statement in 1976 indicates disapproval with the regulation provisions specifying when the value of an option is "readily ascertainable." See, e.g., Billman, "Nonstatutory Stock Options," 383 Tax Management A-8 (1984); Diamond & Salles, "The Receipt of Property for Services After the TRA," Tax Advisor 325, 334 (May 1988); Nolan, "Deferred Compensation and Employee Options Under the New Section 83 Regulations," 56 Taxes 790, 795-796 (1979). We, however, do not interpret that statement to express Congress' disapproval of the regulation provisions. As embodied in the regulations under sections 61 and 421 and the proposed regulations under section 83, the Treasury position has been consistent since 1961 on the issue of when an option has a readily ascertainable value. If Congress in 1976 truly disapproved of the Treasury position, it could have enacted statutory provisions and superseded the Treasury's ability to take such a position.

The Senate version of the 1976 Act in fact contained a provision whereby taxpayers would have been able to elect to be taxed on the option at the time of grant, regardless of the difficulty of ascertaining the value of the option. See S. Rept. 94-938, 1976-3 C.B. (Vol. 3) 164. The fact that the provision from the Senate was deleted from the bill by the Conference committee (see H. Rept. 94-1515 (Conf.), *supra* at 438) indicates to us that Congress' intent was not necessarily to overrule the regulation provisions. Rather, the above quoted paragraph from the Conference report appears to have been included to assuage the members from the Senate who were unable to amass sufficient support for the provision to be passed into law. We read the quoted paragraph as only an invitation for Treasury to prescribe provisions that Congress, itself, was unable to agree upon or adopt; we do not interpret it as a specific statement of congressional disapproval with the regulatory scheme.

In short, Congress' silence indicates to us that it did not perceive the regulatory provisions to be unreasonable or plainly contrary to congressional intent. Indeed, the regulations further a policy under which there is reasonable accuracy in the valuation of nonpublicly traded options. As we have stated in regard to the valuation rules of regulations section 1.421-6:

Surely, it cannot be considered unreasonable to require reasonable accuracy in the valuation of stock options. To hold otherwise would be to encourage estimates of fair market value of such rights on the basis of pure speculation and surmise.

*Weigl v. Commissioner,* 84 T.C. at 1216; *Frank v. Commissioner,* 54 T.C. 75, 94 (1970), affd. 447 F.2d 552 (7th Cir. 1971). That policy is not altered by the enactment of section 83. We therefore find that section 1.83-7, Income Tax Regs., is not unreasonable and not plainly at variance with section 83, and we hold that the regulation is valid insofar as it applies to the facts in the instant case.

Besides upsetting a regulatory scheme which has been the Treasury position for 25 years, a contrary finding would run counter to numerous cases, e.g., *Bagley v. Commissioner,* 85 T.C. 669 (1985), affd. per curiam 806 F.2d 1969 (8th Cir. 1986); *Weigl v. Commissioner,* 84 T.C. at 1215-1217, and cases cited therein; *Simmonds Precision Products, Inc. v.*

*Commissioner,* 75 T.C. 103 (1980); *Cohn v. Commissioner,* 73 T.C. 443 (1979); *Shamburger v. Commissioner,* 61 T.C. 85 (1973), affd. per curiam 508 F.2d 883 (8th Cir. 1975). We believe that such a long-standing, consistent scheme of taxation provides stability and certainty in the law and overrides any concerns that application of that scheme in the instant case causes an apparent incongruous result. Accordingly, we find for respondent in regard to the gain from the sale of the warrant.

To reflect the parties' concessions,

*Decision will be entered under Rule 155.*