T.C. Memo. 2000-40

UNITED STATES TAX COURT


TOYOTA TOWN, INC., A CALIFORNIA CORPORATION, ET AL.,[1]
Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 4959-95, 4960-95,      Filed February 8, 2000.
4961-95, 22741-95,
1254-96, 1255-96,
1256-96.


Bruce I. Hochman and Frederic J. Adam (specially

recognized), for petitioners.

Nancy C. McCurley, for respondent.

---

[1] Cases of the following petitioners are consolidated herewith: Country Nissan, A California Corporation, docket No. 4960-95; Quality Motor Cars of Stockton, A California Corporation, docket No. 4961-95; Robert S. and Christina Zamora, docket No. 22741-95; Bob Wondries Motors, Inc., d.b.a. Wondries Ford, docket No. 1254-96; Wondries Nissan, Inc., docket No. 1255-96; and Bob Wondries Associates, Inc., d.b.a. Wondries Toyota, docket No. 1256-96.

MEMORANDUM OPINION

GALE, <u>Judge</u>:  Respondent determined deficiencies in petitioners' Federal income taxes as follows:

| Petitioner | Taxable Year Ended Nov. 30 | | |
|---|---|---|---|
| | 1991 | 1992 | 1993 |
| Toyota Town, Inc. | $8,812 | $9,535 | $6,762 |
| Country Nissan | 4,432 | 4,444 | 4,373 |
| Quality Motor Cars of Stockton | -- | 2,429 | 2,746 |
| Bob Wondries Motors, Inc., d.b.a. Wondries Ford | -- | 6,810 | 3,457 |
| Wondries Nissan, Inc. | -- | 4,131 | 5,470 |
| Bob Wondries Motors, Inc., d.b.a. Wondries Toyota | -- | 6,683 | 12,967 |

Respondent also determined deficiencies in the Federal income taxes of petitioners Robert S. and Christina Zamora for the taxable years ended December 31, 1992 and 1993, of $212 and $6,520, respectively.

These cases were consolidated for trial, briefing, and opinion.[2]  Petitioners include the following corporations: Toyota Town, Inc.; Country Nissan, A California Corporation; Quality Motor Cars of Stockton, A California Corporation; Bob Wondries Motors, Inc., d.b.a. Wondries Ford; Wondries Nissan, Inc.; and Bob Wondries Associates, Inc., d.b.a. Wondries Toyota; as well as individual petitioners Robert S. and Christina Zamora (Zamoras), who filed joint returns for the years in issue.  The Zamoras owned, during the years in issue, approximately 48 percent of the issued and outstanding shares of Wondries Chevrolet, Inc. (Wondries Chevrolet), an S corporation within the meaning of section 1361(a).[3]  For convenience, we shall hereinafter refer to Wondries Chevrolet and the C-corporation petitioners collectively as petitioners.

The issue for decision is the proper period for petitioners to deduct insurance premium expense incurred in connection with sales of extended warranty agreements to their customers.

---

[2] In docket No. 4959-95, the adjustment relating to the 1991 taxable year is not in dispute.  In docket No. 4960-95 only the adjustments relating to the 1992 and 1993 taxable years have been consolidated, and the adjustment relating to the 1991 taxable year is not in dispute.  In the remaining docket Nos., 4961-95, 22741-95, 1254-96, 1255-96, and 1256-96, all adjustments are attributable to the common issue in dispute.

[3] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

These cases were submitted fully stipulated pursuant to Rule 122. Our findings of fact are based upon the parties' stipulation and the attached exhibits, which are incorporated by this reference. The parties have stipulated that any appeal in this matter lies to the U.S. Court of Appeals for the Ninth Circuit.

## Background

During the years in issue, petitioners were engaged in business as retail automobile dealers, in connection with which they sold extended warranty agreements (EWA's) to certain retail purchasers of new and used motor vehicles. Under such EWA's, petitioners agreed, in exchange for a single lump-sum fee, to replace or repair, or to reimburse for the repair of, various components of a vehicle that failed during an extended multiyear period.[4] After a customer agreed to purchase a vehicle, the customer was informed of the option to purchase an EWA. The customer was free to accept or decline and could elect coverages that varied with respect to years, mileage, or items covered. The fee or price paid to petitioners by their customers for an EWA depended upon the coverages selected.

An EWA expressly provides that it is a "SERVICE CONTRACT

---

[4] The coverage period could be denominated 5, 6, or 7 years or be further restricted by a stated mileage limit, in which case the coverage would terminate upon the first of either to elapse.

* * * BETWEEN THE DEALER [i.e., each petitioner] AND YOU [the vehicle purchaser]" and is "NOT AN INSURANCE POLICY".  An EWA further provides that "Dealer in regards to this contract is acting as a Principal and not as an Agent on behalf of any insurer."  An EWA also states:  "Issuing Dealer has insurance with Western General Insurance Co., * * * – a Licensed Insurer."  Finally, an EWA provides:

> NOTICE: If a Breakdown Claim has been filed with the Issuing Dealer who has failed to pay the claim within sixty (60) days after proof of loss has been filed with the Issuing Dealer, you the Service Contract Purchaser shall also be entitled to make a Direct Claim against the Issuing Dealer's insurance company, Western General Insurance Company * * *

During the years in issue, each petitioner sold EWA's pursuant to an agreement (Western General Agreement) with the Western General Insurance Co. of Encino, California (Western General), under which Western General assumed petitioners' liabilities under the EWA's in exchange for a single lump-sum payment with respect to each EWA, referred to in the agreements as an "insurance premium and policy fee".  Under the Western General Agreement, Western General agreed "to issue and maintain individual insurance policy coverage at DEALER'S [i.e., each petitioner's] expense which shall insure the DEALER for covered costs of repairs and/or replacements incurred by the DEALER and covered under the * * * EWA".  Each petitioner agreed to sell EWA's only through the forms provided by Western General and to

follow the underwriting, rating, instructions, and procedures outlined by Western General. Each petitioner further agreed to report to Western General every 10 days the EWA's sold during the preceding 10 days and to remit "the insurance premium as provided in * * * [Western General's] rate chart/manual".[5]

Each EWA sold to a customer included an individual Motor Vehicle Policy of Mechanical Insurance (Vehicle Policy) naming a petitioner as the insured and listing a covered vehicle, EWA purchaser, and (multiyear) coverage period corresponding to the EWA. A Vehicle Policy provides that the premium "shall become fully earned" by Western General upon inception of the coverage; however, the Vehicle Policy subsequently provides exceptions under which a pro rata refund of the premium will be made, including an election by the insured (i.e., each petitioner) to cancel within 90 days after inception or the repossession of the covered vehicle.

Petitioners were not affiliated with or related to Western General in any way.

Once a petitioner remitted the premium to Western General, the risk of loss on the related EWA passed entirely to Western General. Upon payment of the premium, Western General was solely responsible to the vehicle purchaser for the cost of repairs

---

[5] The parties have stipulated that petitioners in fact made all such payments to Western General within 60 days after an EWA was purchased by one of petitioners' customers.

covered by the EWA and was obligated to reimburse the purchaser for claims covered by the EWA provided the purchaser followed the proper claims procedures.  The purchaser could obtain the repairs at a repair facility other than the Dealership from which the vehicle was purchased, so long as the purchaser complied with the terms of the EWA, which provides:

> In the event of a Breakdown [i.e., the failure of a covered part], you [i.e., the EWA purchaser] must follow this procedure.
> 1. Return your vehicle to the Dealer [i.e., each petitioner].  If this is not possible or practical, you must call his Claims Service (insurer) [i.e., Western General] for instructions * * *

Petitioners are accrual method taxpayers.  For the years in issue, petitioners elected to report their income from the EWA's using the "service warranty income method" set forth in Rev. Proc. 92-98, 1992-2 C.B. 512, 514.  Rev. Proc. 92-98, supra, permits certain accrual method sellers of motor vehicles and other durable consumer goods that receive a lump-sum payment (advance payment) from the sale of a multiyear service warranty contract to defer recognition of a portion of the advance payment generally over the life of the service warranty obligation.  The portion of the advance payment permitted to be deferred under Rev. Proc. 92-98, supra, is the amount paid by the seller (within 60 days of receipt) to an unrelated third party for insurance costs associated with a policy insuring the seller's obligations under the service warranty contract (the qualified advance

payment amount).  (The excess of the advance payment over the qualified advance payment amount is included in the seller's income in the taxable year of receipt.)  The revenue procedure provides that the qualified advance payment amount, as augmented by certain imputed income equal to the interest cost of the income deferral, can be deferred and included ratably in income over the shorter of (1) the period beginning in the taxable year the advance payment is received and ending when the service warranty contract terminates, or (2) a 6-taxable-year period beginning in the taxable year the advance payment is received.[6] For purposes of computing the deferral period and the "interest-equivalent" imputed income, all advance payments for service warranty contracts sold during the taxable year are effectively treated as if they were entered into, and payment received, on the first day of the taxable year.

Rev. Proc. 92-98, supra, further provides that an election to use the service warranty income method is not available to a taxpayer unless the taxpayer uses the proper method of accounting for amounts paid or incurred for insurance costs that cover the taxpayer's risks under the service warranty contracts, as outlined in a revenue procedure issued simultaneously with Rev. Proc. 92-98, supra; namely, Rev. Proc. 92-97, 1992-2 C.B. 510.

---

[6] The series of level payments thus generated is designed to equal the present value of the qualified advance payment amount.

See Rev. Proc. 92-98, secs. 9, 4.04, 1992-2 C.B. at 517, 513. With respect to accounting for insurance costs, Rev. Proc. 92-97, supra, provides that lump-sum amounts, paid in advance for multiyear insurance policies to insure a consumer durable goods seller's obligations to customers under multiyear warranty contracts sold to them, must be capitalized and prorated or amortized over the life of the insurance policy. See Rev. Proc. 92-97, sec. 2.07, 1992-2 C.B. at 511.

During the years at issue, in accordance with Rev. Proc. 92-98, supra, petitioners reported as income in the year of receipt the difference between the total amount received from the sale of EWA's and the total amount paid to Western General. The remaining proceeds from the sale of EWA's--i.e., the amounts paid to Western General to insure petitioners' risks under the EWA's, or qualified advance payment amounts--were, as increased by an interest-equivalent factor, included in income ratably over the terms of the EWA's. Pursuant to Rev. Proc. 92-98, supra, for purposes of computing the income required to be included each year in connection with the qualified advance payment amount, petitioners treated the proceeds from the sale of EWA's as having been received on the first day of the taxable year in which an EWA was sold.

Petitioners took deductions for the amounts paid to Western General for assumption of the EWA liabilities by capitalizing

such amounts and amortizing them in a manner which departed in one respect from the method prescribed in Rev. Proc. 92-97, supra. Whereas Rev. Proc. 92-97, supra, provides that a seller's payment for a multiyear insurance policy covering the seller's obligations under a service warranty contract must be amortized over the actual life of the policy, petitioners computed their amortization deductions using an accounting convention under which the premium payment and policy inception were deemed to have occurred on the first day of the taxable year in which the policy was obtained, irrespective of the actual date of payment and policy inception. This methodology, which resembled the convention prescribed in Rev. Proc. 92-98, supra, for the recognition of income from the qualified advance payment amount, resulted in petitioners' taking amortization deductions in the first taxable year of a policy's inception equal to a full year's worth of amortization, without regard to the actual date of payment and policy inception. In effect, this increase in the first year's amortization deduction caused it, as well as each ensuing year's deduction, to match the ratable portion of the deferred EWA income required to be included pursuant to the terms of Rev. Proc. 92-98, supra. As a result, the "net" income recognized by petitioners consisted only of the excess of the aggregate EWA prices charged to petitioners' customers over the aggregate premiums paid by petitioners to Western General in the

year of inception of an EWA, plus the imputed income represented by the interest-equivalent factor in each of the years of the contract term.

In the notices of deficiency, respondent determined that the service warranty income reported by petitioners had been computed incorrectly for the years in issue.[7] Respondent contends that petitioners incorrectly computed their deduction for insurance costs in the year a policy was purchased by taking a full year's worth of amortization rather than amortization measured from the actual date of the policy's inception and payment of the premium. In the absence of information regarding the actual dates of sale of EWA's, respondent recomputed petitioners' amortization deductions on the assumption that the transactions had occurred ratably over the years in issue.

In their petitions, petitioners alleged that respondent erred in recomputing the amortization deductions, contending that their amortization of insurance expense should be computed using the same methodology as that used in computing receipt of EWA income; that is, the convention deeming qualified advance payment amounts as having been received on the first day of the taxable year should likewise apply for amortization of insurance expense,

---

[7] In the case of the Zamoras, the deficiency was determined on the basis of the Zamoras' distributive share of comparable adjustments made to the warranty income of their S corporation, Wondries Chevrolet.

so that payments for insurance of the warranty risk should be deemed to have occurred on the first day of the taxable year for all such payments, regardless of when the payments were actually made.

## Discussion

### I. Matters Properly Raised

As a preliminary matter, we must first decide which issues have been properly raised in these cases. In addition to the proper period for amortizing insurance expense, which was challenged in respondent's determination and was the basis on which petitioners assigned error to that determination in their petitions, petitioners now argue, for the first time on brief, that the EWA proceeds that were remitted to Western General are not income to petitioners, on the basis of the "claim of right" doctrine and income attribution principles. Should petitioners prevail with respect to these contentions, they maintain that they are entitled to refunds for overpayments in the years at issue. Respondent objects to our consideration of petitioners' claims that the amounts paid to Western General are not income to them, on the grounds that respondent did not receive "fair warning" of petitioners' intention to raise this issue.

We believe the inclusion of the amounts paid to Western General in petitioners' income is not an issue properly before us for two reasons. First, petitioners fully conceded this issue

before submission of these cases. Petitioners have stipulated that the portion of the EWA proceeds that was paid over to Western General "was * * * <u>properly</u> included in [petitioners'] income over the terms of the EWA in accordance with Revenue Procedure 92-98". (Emphasis added.) Second, to the extent there is any conceivable ambiguity in this stipulation (and we do not suggest that there is), we believe that respondent is correct that he did not receive "fair warning" of petitioners' intention to raise any issue concerning income inclusion.

As a pleading, the petition has as its purpose "to give the parties and the Court fair notice of the matters in controversy". Rule 31(a). Generally speaking, issues not raised in the assignments of error in the petition are deemed conceded. See Rule 34(b)(4). Whether issues not raised in the pleadings will nonetheless be considered is a matter for the Court's discretion, taking into account the prejudice to the opposing party.

> The rule that a party may not raise a new issue on brief is not absolute. Rather, it is founded upon the exercise of judicial discretion in determining whether considerations of surprise and prejudice require that a party be protected from having to face a belated confrontation which precludes or limits that party's opportunity to present pertinent evidence. * * * [<u>Ware v. Commissioner</u>, 92 T.C. 1267, 1268 (1989), affd. 906 F.2d 62 (2d Cir. 1990).]

It is clear that petitioners did not provide notice in their petitions of an intention to contest the inclusion in income of the amounts paid to Western General. The error alleged in the

petitions, which are substantially identical, was respondent's failure to permit consistent treatment of service warranty income and associated insurance expense.  As phrased in the petitions, "The narrow issue involved herein is the consistent treatment of the service warranty income and the offsetting premium expense".  There were no claims of overpayments.  No amendments of the pleadings have been sought or granted.  The parties agreed to submit these cases fully stipulated in accordance with Rule 122.  Approximately 2 weeks before submission of the cases, petitioners served a trial memorandum upon respondent in which they listed the sole issue in the cases as:  "What is the proper tax period for deducting amounts paid by a retail auto dealer in connection with its obligations to its customers under extended warranty agreements?".[8]

We believe respondent justifiably concluded that petitioners were not contesting the inclusion in their income of amounts paid to Western General.  We further find that respondent would be prejudiced if petitioners were permitted to raise this issue for the first time on brief in fully stipulated cases.  "'Of key importance in evaluating the existence of prejudice is the amount

_____

[8] Although in the analysis section of their trial memorandum petitioners at one point characterize the amounts they paid to Western General as "phantom income" in which they have "no interest", we do not believe this single reference in an extended discussion constitutes adequate notice that petitioners intended to raise "claim of right" or income attribution issues.

of surprise and the need for additional evidence on behalf of the party opposed to the new position.'" Sundstrand Corp. v. Commissioner, 96 T.C. 226, 347 (1991) (quoting Pagel, Inc. v. Commissioner, 91 T.C. 200, 211-212 (1988), affd. 905 F.2d 1190 (8th Cir. 1990)). Because the parties agreed to submit these cases fully stipulated, respondent made his decisions regarding what evidence to proffer on the basis of the pleadings and the stipulations, including the stipulation that the amounts paid to Western General were "properly" included in petitioners' income. To be confronted with this new issue after the evidentiary record is closed is prejudicial to respondent. Accordingly, we will not consider whether the amounts paid to Western General were not includable in petitioners' income on the basis of the "claim of right" doctrine or income attribution principles. Instead, we shall consider only the issue that was properly raised; namely, the appropriate period for deducting the amounts paid by petitioners to a third-party insurer to assume petitioners' risks under the EWA's that petitioners sold to their customers.

II. Proper Period To Deduct Amounts Paid for Multiyear Insurance

A. Petitioners' Arguments

To support their position that respondent's determinations are erroneous, petitioners argue that respondent abused his discretion by requiring petitioners to change their method of

accounting[9] from one that clearly reflects income to a method that distorts income, or, alternatively, that the qualified advance payment amounts should be fully deductible in the year paid to Western General.  We consider each in turn.

B. Abuse of Discretion

1. In General

Petitioners contend that respondent's effort to limit their amortization deduction for insurance costs to a pro rata portion of the premium in the first year, measured by the portion of the year for which the policy was actually in force, constitutes an abuse of discretion.  In petitioners' view, the method of accounting for insurance costs for multiyear policies that they employed, which involved deducting a full year's worth of premium in the first year, regardless of the actual date of commencement of coverage, effects a clear reflection of income because it more closely matches expense with associated income--given the requirement of Rev. Proc. 92-98, 1992-2 C.B. 512, that the corresponding income be recognized under a convention that treats it as received on the first day of the year without regard to actual receipt.  The method sought by respondent, petitioners

---

[9] The parties do not dispute that the timing of petitioners' deductions for the amounts paid to Western General constitutes a "method of accounting" within the meaning of sec. 446.  See sec. 1.446-1(a)(1), Income Tax Regs. ("The term 'method of accounting' includes not only the over-all method of accounting of the taxpayer but also the accounting treatment of any item.").

contend, distorts income because it limits the deduction of the expense associated with an EWA to a partial year's portion when a full year's portion of associated income must be recognized pursuant to Rev. Proc. 92-98, supra.  Petitioners summarize their argument as follows:

> Because petitioner's method of accounting is an acceptable method which clearly reflects its income, Respondent is not allowed to require petitioner to change its method of accounting.  Prabel v. Commissioner, * * *  [91 T.C. 1101, 1112 (1988), affd. 882 F.3d 880 (3d Cir. 1989)]; Hallmark Cards, Inc. v. Commissioner, * * * [90 T.C. 26, 31 (1988)].  To force a change from a method which clearly reflects excessive[10] income to a method which materially distorts income, is an abuse of discretion.  Molsen v. Commissioner, 85 T.C. 485, 498, 509 (1985). * * *

Petitioners' position, in effect, is that they may report their income from EWA's in accordance with the provisions of Rev. Proc. 92-98, supra, but with respect to the computation of deductions arising from EWA transactions, they are free to disregard the method outlined in Rev. Proc. 92-97, 1992-2 C.B. 510, and devise a method that more closely matches the income and expense associated with the qualified advance payment amount.

Petitioners are wrong, for at least two reasons.  First, it is not an abuse of discretion for the Commissioner to establish

---

[10] Petitioners' reference to "excessive" income is apparently an allusion to their belief that the imputed income required to be recognized under Rev. Proc. 92-98, 1992-2 C.B. 512, is not appropriate.

reasonable conditions upon the use of an accounting method that has been established administratively.  Second, even disregarding any authority of the Commissioner to impose conditions upon the use of an administratively established accounting method, petitioners are not entitled to use the amortization method they have employed because it contravenes the regulations.

### 2. Reasonable Administrative Conditions

Petitioners describe the instant cases as ones where respondent is attempting to "force" petitioners to change from a method of accounting which clearly reflects income to one which does not.  We disagree with this characterization.  Respondent has not attempted to "force" a change in petitioners' accounting methods.  Rather, the Commissioner, relying upon his authority under section 446(b), administratively established in Rev. Proc. 92-98, supra, a method of accounting for certain prepaid services income of accrual basis taxpayers engaged in the sale of multiyear service warranty contracts for which third-party insurance is obtained.  Petitioners elected this method, which permits deferral of a portion of the prepaid services income (equal to the amount which is paid over to a third party to assume the risk under the warranty contracts).

The Commissioner imposed certain conditions, however, upon a taxpayer's eligibility to elect the method provided in Rev. Proc. 92-98, supra, including specifically the requirement that an

electing taxpayer account for the insurance expense associated with the warranty contracts under the method described in Rev. Proc. 92-97, supra.  Petitioners disregarded this requirement and used a different method to account for insurance expense. Petitioners effectively argue that they are entitled to do so because their method of amortizing insurance expense, which treats the coverage period as if it commenced on the first day of the taxable year regardless of the actual date, results in better matching with the prepaid income that is deferred under Rev. Proc. 92-98, supra, since such income is recognized under a convention that likewise deems all amounts received on the first day of the taxable year regardless of actual date.  Because of the matching achieved under their method, petitioners contend it clearly reflects income while the method sought by respondent does not.

Petitioners may not avail themselves of the benefits of deferral provided in Rev. Proc. 92-98, supra, without adhering to the conditions imposed by the Commissioner.  See Mulholland v. United States, 28 Fed. Cl. 320, 344 (1993) (taxpayers' failure to adhere to conditions of a revenue procedure renders them ineligible for its benefits), affd. 22 F.3d 1105 (Fed. Cir. 1994).  Rev. Proc. 92-98, supra, is the only authority cited by petitioners for the method which defers recognition of a portion

of a prepayment for a multiyear warranty agreement.[11]  Absent

Rev. Proc. 92-98, supra, the Commissioner generally would have

discretion under section 446(b) to deny taxpayers the right to

defer prepaid services income until the periods when related

costs will be incurred and taken into account.  See Schlude v.

Commissioner, 372 U.S. 128 (1963); American Auto. Association v.

United States, 367 U.S. 687 (1961); Automobile Club of Michigan

v. Commissioner, 353 U.S. 180 (1957); RCA Corp. v. United States,

664 F.2d 881, 885-888 (2d Cir. 1981); Johnson v. Commissioner,

108 T.C. 448, 491-492 (1997), affd. in part, revd. in part and

remanded 184 F.3d 786 (8th Cir. 1999); see also Hinshaw's, Inc.

v. Commissioner, T.C. Memo. 1994-327 (requiring recognition of

prepayment for extended warranty services in year of receipt, in

circumstances nearly identical to instant cases).  Thus, the

basis for deferral that petitioners claim is only available to

them if they meet the conditions of eligibility.  See Mulholland

v. United States, supra.  It is not an abuse of discretion for

respondent to impose as a condition on the election of the method

in Rev. Proc. 92-98, supra, the requirement that petitioners use

the method in Rev. Proc. 92-97, supra, to account for their

---

[11] Petitioners attempted to advance the argument on brief
that the amounts paid to Western General were not income to them
at all.  We concluded, supra, that this issue was not properly
raised.  In any event, such an argument offers no basis for the
deferral of income; it concerns exclusion of income, not
deferral.

insurance expense, since this condition, as discussed more fully below, does no more than require adherence to existing regulations. We think the Commissioner's broad discretion to determine whether a method of accounting clearly reflects income under section 446(b), see <u>Thor Power Tool Co. v. Commissioner</u>, 439 U.S. 522 (1979); <u>Commissioner v. Hansen</u>, 360 U.S. 446, 467 (1959), coupled with the requirement in section 446(e) that the Commissioner's consent be secured for any change in method, encompasses the authority to impose the condition at issue herein.

Petitioners' argument that their method of accounting for insurance expense produces superior matching of income and related expense is unavailing. Matching of income and related expense does not necessarily result in a clear reflection of income for tax purposes. See <u>Thor Power Tool Co. v. Commissioner</u>, <u>supra</u> at 543. A prepayment for services to be performed in the future must be recognized when received, even though this would mismatch expenses and revenues. See <u>American Auto. Association v. United States</u>, <u>supra</u>; <u>Automobile Club of Michigan v. Commissioner</u>, <u>supra</u>. Absent Rev. Proc. 92-98, <u>supra</u>, existing law would require an even greater mismatch of EWA income and associated insurance expense than the "distortion" that petitioners complain is produced by Rev. Procs. 92-98 and 92-97, <u>supra</u>. Existing law would require the recognition of the

entire amount of EWA income in the year of receipt without regard to the period in which related insurance expense would be deferred.  See Schlude v. Commissioner, supra; American Auto. Association v. United States, supra; Automobile Club of Michigan v. Commissioner, supra; Johnson v. Commissioner, supra; Hinshaw's, Inc. v. Commissioner, supra.  The Commissioner acted within his authority under section 446(b) to allow taxpayer-favorable deferral of income in Rev. Proc. 92-98, 1992-2 C.B. 512; the Commissioner is not required to make the further concession of accelerating deductions beyond the requirements of existing law.

### 3. Compliance With Regulations

Relying on Prabel v. Commissioner, 91 T.C. 1101 (1988), and Hallmark v. Commissioner, 90 T.C. 26 (1988), petitioners argue that respondent may not require petitioners to change their current method because it is "an acceptable method which clearly reflects * * * [petitioners'] income".  Petitioners' reliance is misplaced.  Prabel and Hallmark hold that the Commissioner may not disturb a taxpayer's method of accounting that is specifically authorized in the Internal Revenue Code or income tax regulations.  The method used by petitioners to amortize the amounts paid to Western General, by contrast, violates the regulations.

- 23 -

For accrual basis taxpayers such as petitioners, a liability is incurred in the taxable year in which all events have occurred that establish the fact of the liability, the amount of the liability can be determined with reasonable accuracy, and economic performance has occurred with respect to the liability. See secs. 1.446-1(c)(1)(ii)(A), 1.461-1(a)(2), Income Tax Regs. With respect to economic performance, the regulations provide that where the liability arises out of the provision of insurance to the taxpayer, economic performance occurs when payment is made to the insurer. See sec. 1.461-4(g)(5), Income Tax Regs.

Section 1.461-1(a)(2), Income Tax Regs., further provides that while a liability is generally taken into account for Federal income tax purposes in the taxable year in which it is incurred, the Internal Revenue Code and income tax regulations provide exceptions to the general rule, including where capitalization is required.

> Applicable provisions of the Code, the Income Tax Regulations, and other guidance published by the Secretary prescribe the manner in which a liability that has been incurred is taken into account. For example, * * * under section 263 or 263A, a liability that relates to the creation of an asset having a useful life extending substantially beyond the close of the taxable year is taken into account in the taxable year incurred through capitalization (within the meaning of § 1.263A-1(c)(3)), and may later affect the computation of taxable income through depreciation or otherwise over a period including subsequent taxable years, in accordance with applicable Internal Revenue Code sections and guidance published by the Secretary. * * * [Sec. 1.461-1(a)(2)(i), Income Tax Regs.]

A prepayment for multiyear insurance coverage creates an asset having a useful life longer than a taxable year, which must be capitalized.  See Higginbotham-Bailey-Logan Co. v. Commissioner, 8 B.T.A. 566, 577 (1927); sec. 1.461-4(g)(8), Example (6), Income Tax Regs.; see also USFreightways Corp. v. Commissioner, 113 T.C. ___ (1999); Johnson v. Commissioner, supra at 488; Hinshaw's, Inc. v. Commissioner, T.C. Memo. 1994-327.  The prepaid insurance is an intangible, and its coverage period gives it a determinable useful life, making it eligible for a "depreciation allowance".  Sec. 1.167(a)-3, Income Tax Regs.  The rules for computing the proper period for a depreciation allowance are provided in section 1.167(a)-10(b), Income Tax Regs., which states in relevant part:

> (b) The period for depreciation of an asset shall begin when the asset is placed in service and shall end when the asset is retired from service.  A proportionate part of one year's depreciation is allowable for that part of the first and last year during which the asset was in service. * * *

In general, "an asset is 'placed in service' for depreciation purposes when it is acquired and available for use." Clairmont v. Commissioner, 64 T.C. 1130, 1136 (1975), affd. without published opinion 538 F.2d 332 (8th Cir. 1976).  Petitioners' claim of a full year's amortization in the first year that a multiyear insurance policy is acquired or placed in service, without regard to when during the year the policy was in fact

placed in service, directly contravenes the rule in section 1.167(a)-10(b), Income Tax Regs., which allows only a "proportionate part of one year's depreciation" in the first and last years of a period of service. We have so held in similar circumstances where the taxpayer sought to claim a full year's depreciation for assets placed in service at any time during the first 5 months of the taxable year. See Clairmont v. Commissioner, supra at 1136.

Petitioners cite no authority for their method of amortization, other than to claim that, by precisely matching the recognition of the deferred insurance expense with the recognition of the deferred income permitted in Rev. Proc. 92-98, supra, for their EWA's, they have effected a clear reflection of income, which respondent may not disturb. However, a method of accounting that is "plainly inconsistent" with valid regulations does not clearly reflect income within the meaning of section 446(b). Thor Power Tool Co. v. Commissioner, 439 U.S. at 533; see Van Raden v. Commissioner, 71 T.C. 1083, 1105 (1979), affd. 650 F.2d 1046 (9th Cir. 1981).

### 4. Whether Petitioners Purchased Insurance

Petitioners also argue that the agreement they entered with Western General did not constitute insurance--specifically, that petitioners' liability to Western General did not arise out of the provision of insurance and therefore the payments to Western

General neither created a capital asset nor required amortization. Petitioners employ the contention that they did not purchase insurance from Western General both in an effort to avoid the dictates of the foregoing capitalization rules and as the basis for their alternative argument that the payments to Western General were fully deductible in the year paid.

Nevertheless, the record contradicts petitioners' contention that the arrangement with Western General did not constitute the provision of insurance to them. In their petitions, petitioners assert as a fact that they managed the risks associated with the future obligations they assumed under the EWA's "by obtaining commercial insurance coverage therefor from an unrelated third-party insurer, Western General Insurance Co.". Because petitioners did not dispute the nature of their arrangement with Western General as constituting the purchase of insurance until after submission of these cases fully stipulated, the record with respect to this issue is not exhaustive. However, the available evidence belies petitioners' claim. First, petitioners have stipulated that the amounts paid to Western General were for insurance costs. Specifically, petitioners stipulated that "All amounts paid to Western General during the years at issue by * * * petitioners constitute qualified advance payment amounts." Rev. Proc. 92-98, 1992-2 C.B. at 513, to which reference is repeatedly made in the stipulations, defines the term "qualified

advance payment amount" as "the portion of an advance payment received by a taxpayer under a multi-year service warranty contract that is paid by that taxpayer to an unrelated third party * * * for insurance costs associated with a policy insuring that taxpayer's obligations under the contract".  Moreover, the EWA's between petitioners and their customers warrant that the "Issuing Dealer has insurance with Western General Insurance Co., * * *--a Licensed Insurer."  The Western General Agreement entered into by each petitioner and Western General states that Western General agrees to "issue and maintain individual insurance policy coverage at DEALER'S [i.e., each petitioner's] expense which shall insure the DEALER for covered costs of repairs and/or replacements incurred by the DEALER and covered under the * * * [EWA]" and that each petitioner agrees to remit to Western General "the insurance premium as provided in its rate chart/manual".

In addition to the foregoing admissions, stipulations, and agreement terms, the evidence of the substance of petitioners' arrangements with Western General supports the conclusion that petitioners' liability to Western General arose from the provision of insurance.  The regulations which define "economic performance" in the case of a liability for insurance provided to the taxpayer further provide that "insurance" for this purpose "has the same meaning as is used when determining the

deductibility of amounts paid or incurred for insurance under section 162." Sec. 1.461-4(g)(5)(ii), Income Tax Regs. The arrangements between petitioners and Western General involved an insurance risk (namely, the risk of loss associated with the liability assumed by the seller of an EWA), the shifting of that risk from each petitioner to Western General (as the parties have stipulated that the risk of loss under the EWA's passed from petitioners to Western General once petitioners made payment to Western General), and the distribution or pooling of that risk (since the record establishes that Western General assumed the risks of multiple sellers of EWA's). Thus we believe petitioners purchased "insurance" from Western General for purposes of section 162. Cf. Sears, Roebuck & Co. v. Commissioner, 96 T.C. 61, 100-101 (1991), affd. in part, revd in part and remanded on another issue 972 F.2d 858 (7th Cir. 1992). We also note that applicable State law requires retail automobile dealers, such as petitioners, that sell vehicle service contracts incident to automobile sales either to purchase insurance covering their liabilities under such contracts or to become insurers subject to the provisions of the California Insurance Code and regulation by the California Department of Insurance. See Cal. Ins. Code sec. 116(c) (West 1993); Clemens v. American Warranty Corp., 238 Cal. Rptr. 339, 344-345 (Ct. App. 1987). Petitioners state on brief that they are not in the insurance business.

On this record, petitioners have failed to show error in respondent's determination insofar as it is premised on the conclusion that petitioners purchased insurance from Western General.

Moreover, in Hinshaw's, Inc. v. Commissioner, T.C. Memo. 1994-327, we held in virtually identical circumstances that the prepayment of a multiyear insurance policy covering the taxpayer's obligations under a multiyear vehicle service contract is not deductible in the year of payment but must be amortized over the life of the coverage. We reasoned that the taxpayer acquired a long-term asset by purchasing insurance covering a period greater than 1 year and that, since the taxpayer benefited from the coverage for more than 1 year, the cost must be capitalized. See id.; see also Johnson v. Commissioner, 108 T.C. at 488.[12]

Petitioners attempt to distinguish Hinshaw's, Inc. v. Commissioner, supra, on the basis that the "policies" obtained

_____

[12] In Johnson v. Commissioner, 184 F.3d 786 (8th Cir. 1999) affg. in part, revg. in part and remanding 108 T.C. 448 (1997), the Court of Appeals for the Eighth Circuit affirmed our holding that the cost of insurance premiums was required to be capitalized and amortized over the life of the coverage. However, the Court of Appeals reversed with respect to certain fees paid for administrative services provided by an administrator unrelated to the insurer, holding that such fees were deductible in the year of payment. See id. at 789. Here, petitioners have stipulated, and the other evidence indicates, as discussed supra, that all amounts paid to Western General were for insurance costs.

from Western General had no surrender value, and on the basis that petitioners remained primarily liable on their service contracts (i.e., the EWA's). Petitioners' assertion that the policies had no surrender value appears to be in error. Although the Vehicle Policies provide that Western General's premium is fully earned upon the inception of coverage, the Policies provide exceptions where a pro rata refund of the premium would be provided to petitioners, such as when a vehicle is repossessed. Further, we are not persuaded that the absence of a surrender value affects the capitalization requirement for a prepaid multiyear insurance policy. Regardless of surrender value, the policies herein afforded protection to petitioners with respect to covered claims for a period of years, and there is no indication in recent decisions involving prepaid insurance coverage for extended service agreements that surrender value was important. See, e.g., Johnson v. Commissioner, supra; Hinshaw's, Inc. v. Commissioner, supra.

As to petitioners' claim that Western General, not they, remained "primarily liable" to the vehicle purchaser, the EWA's provide as follows:

> The Dealer [i.e., each petitioner] will repair and/or replace, or at its option either pay for or reimburse you [i.e., the EWA purchaser] or the repair facility for reasonable costs to repair any of the covered parts * * * which break down.

>   *  *  *  *  *  *  *

Dealer in regards to this contract <u>is acting as a Principal</u> and <u>not as an Agent</u> on behalf of any insurer.

\*  \*  \*  \*  \*  \*  \*

In the event of a Breakdown, you must follow this procedure.
1. Return your vehicle to the Dealer.  If this is not possible or practical, you must call his <u>Claims Service</u> (insurer) for instructions \* \* \*

\*  \*  \*  \*  \*  \*  \*

NOTICE: If a Breakdown Claim has been filed with the Issuing Dealer who has failed to pay the claim within sixty (60) days after proof of loss has been filed with the Issuing Dealer, you the Service Contract Purchaser shall also be entitled to make a Direct Claim against the Issuing Dealer's insurance company, Western General Insurance Company \* \* \* [Emphasis in original.]

The foregoing terms contradict petitioners' assertions and satisfy us that petitioners remained primarily liable on the EWA's, notwithstanding that they had transferred the risk of loss associated with that liability to Western General.

## III.  Conclusion

Because petitioners' payments to Western General were for the provision of multiyear insurance policies, petitioners' method of taking a full year's amortization of the insurance expense in the year of a policy's inception, irrespective of the actual commencement date of the policy, violates the regulations. Accordingly, petitioners' method does not clearly reflect income, and respondent is not proscribed from seeking to change petitioners' method so that it conforms with the requirements of

sections 1.461-1(a)(2)(i) and 1.167(a)-10(b), Income Tax Regs. Where the taxpayer has used a method of accounting that does not clearly reflect income, the Commissioner has considerable discretion to determine a method clearly reflecting income that the taxpayer must use. See sec. 446(b); Thomas v. Commissioner, 92 T.C. 206, 220 (1989). The Commissioner has broad discretion in determining whether a method of accounting clearly reflects income. See Commissioner v. Hansen, 360 U.S. at 447.

Petitioners have offered no evidence of the actual commencement dates of the policies obtained from Western General during the years at issue or otherwise shown error in respondent's determination that such policies were obtained on a ratable basis. Therefore we sustain respondent's determination that petitioners must amortize their insurance expenses on the basis that such expenses were incurred ratably during the years in issue.

To reflect the foregoing,

Decisions will be entered

for respondent.