268 F.3d 1156 (9th Cir. 2001)
 BOB WONDRIES MOTORS, INC., DBA WONDRIES FORD, PETITIONER-APPELLANT,
v.
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT-APPELLEE.
TOYOTA TOWN, INC., A CALIFORNIA CORPORATION, PETITIONER-APPELLANT,
v.
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT-APPELLEE.
WONDRIES NISSAN, INC., PETITIONER-APPELLANT,
v.
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT-APPELLEE.
COUNTRY NISSAN, A CALIFORNIA CORPORATION, PETITIONER-APPELLANT,
v.
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT-APPELLEE.
QUALITY MOTOR CARS OF STOCKTON, A CALIFORNIA CORPORATION, PETITIONER-APPELLANT,
v.
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT-APPELLEE.
BOB WONDRIES ASSOCIATES, INC., D.B.A. WONDRIES TOYOTA, PETITIONER,
v.
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.
ROBERT S. ZAMORA AND CHRISTINA ZAMORA, PETITIONERS,
v.
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.
 Nos. 00-70530, 00-70538, 00-70541, 00-70553, 00-70555, 00-70560 and 00-70561
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted October 11, 2001
Filed: October 23, 2001
 
 Avram Salkin (argued) and Michael R. Stein, Hochman, Salkin, Rettig, Toscher & Perez, Beverly Hills, California, for the petitioners-appellants.
 Frank P. Cihlar (argued) and Joan I. Oppenheimer, United States Department of Justice, Tax Division, Washington, D. C., for the respondent-appellee.
 Appeals from a Decision of the United States Tax Court Joseph H. Gale, Tax Court Judge, Presiding. Tax Ct. Nos. 1254-96, 4959-95, 1255-96, 4960-95, 4961-95, 1256-96, 22741-95.
 Before: Brunetti, Rymer, and Wardlaw, Circuit Judges.
 OPINION
 Rymer, Circuit Judge:
 
 
 1
 Bob Wondries Motors, Inc., Toyota Town, Inc., Wondries Nissan, Inc., Country Nissan, Quality Motor Cars of Stockton, Bob Wondries Associates, Inc., Robert S. Zamora and Christina Zamora (taxpayers) appeal the Tax Court's decision upholding tax deficiencies assessed by the Commissioner of the Internal Revenue Service.[1] Taxpayers are automobile dealerships that deferred part of their prepaid services income from sales of extended warranty agreements, and they question whether they were also required to amortize related insurance expenses from the date of inception of the insurance policies insuring their obligations under the warranty agreements rather than from the first day of the year in which the policy was acquired, as the Commissioner determined and the Tax Court upheld. 79 T.C.M. (CCH) 1457. They also challenge the Tax Court's refusal on the ground of waiver to consider their argument that income from the sale of the extended warranty agreements should not have been included in income. We agree with the Tax Court on both issues, and affirm.
 
 I.
 
 2
 Taxpayers are retail automobile dealers.[2] During the years in issue, they offered to sell an extended warranty agreement (EWA) with the purchase of new or used cars. Under the EWAs, the taxpayers agreed to replace or repair, or reimburse for the repair of, certain parts that failed during a multi-year period in exchange for a single lump-sum fee. The price depended upon the coverage selected.
 
 
 3
 An EWA is a "SERVICE CONTRACT . . . BETWEEN THE DEALER AND YOU [the vehicle purchaser] " and is "NOT AN INSURANCE POLICY." The EWAs provide that the "Dealer in regards to this contract is acting as a Principal and not as an Agent on behalf of any insurer." The EWAs also state that "Issuing Dealer has insurance with Western General Insurance Co." Finally, the EWAs provide:
 
 
 4
 NOTICE: If a Breakdown Claim has been filed with the Issuing Dealer who has failed to pay the claim within sixty (60) days after proof of loss has been filed with the issuing Dealer, you the Service Contract Purchaser shall also be entitled to make a Direct Claim against the Issuing Dealer's insurance company, Western General Insurance Company.
 
 
 5
 Taxpayers sold the EWAs pursuant to an agreement with Western General, under which Western General assumed the taxpayers' liabilities under the EWAs in exchange for the payment of a single lump-sum fee for each EWA ("insurance premium and policy fee"). Taxpayers and Western General are not related or affiliated. Western General agreed "to issue and maintain individual insurance policy coverage at DEALER's expense which shall insure the DEALER for covered costs of repairs and/or replacements incurred by the DEALER and covered under the . . . EWA." The EWAs were sold only through forms provided by Western General, and taxpayers were required to follow the underwriting, rating, instructions and procedures prescribed by Western General. Taxpayers agreed to report to Western General every 10 days on the EWAs sold and to remit "the insurance premium as provided in . . . [Western General's] rate chart/manual."
 
 
 6
 Each EWA included an individual Motor Vehicle Policy of Mechanical Insurance (Vehicle Policy) naming the dealer as the insured and listing the covered vehicle with its corresponding coverage period. The Vehicle Policy states that the premium "shall become fully earned" by Western General on the inception of the coverage. However, the policy provides an exception under which a pro rata refund of the premium will be made if the insured (taxpayers) elect to cancel within 90 days after the inception of coverage or repossession of the covered vehicle.
 
 
 7
 Once the premium was remitted to Western General, the risk of loss on the EWA passed to Western General. Western General was then solely responsible for the cost of repairs covered by the EWA and obligated to reimburse the purchaser for claims covered by the EWA provided the purchaser followed the proper claims procedure.
 
 
 8
 The dealers are accrual method taxpayers. For the relevant years, taxpayers elected to report income from sale of the EWAs using the "service warranty income method " set forth in Rev. Proc. 92-98, 1992-2 C.B. 512, 514. Rev. Proc. 92-98 allows certain accrual method sellers of motor vehicles and other durable consumer goods that receive a lump-sum advance payment from the sale of a multi-year service warranty contract to defer recognition of a portion of the advance payment over the life of the warranty obligation. The portion of advance payment that may be deferred is the amount paid by the dealer (within 60 days of receipt) to an unrelated third party for insurance costs associated with a policy insuring the dealer's obligations under the service warranty contract (the qualified advance payment amount). The excess of the advance payment over the qualified advance payment amount is included in the dealer's gross income in the tax year in which it is received. Rev. Proc. 92-98 allows the qualified advance payment amount, augmented by certain imputed income equal to the interest cost of the income deferral, to be deferred and included ratably over the shorter of the period beginning in the taxable year the advance payment is received and ending when the service warranty contract terminates, or a 6-taxable-year period beginning in the taxable year the advance payment is received.[3] In order to determine the deferral period and the "interest equivalent" imputed income, all advance payments for the EWAs sold during the taxable year are effectively treated as if they were entered into, and payment received, on the first day of the taxable year.
 
 
 9
 Rev. Proc. 92-98 provides that an election to use the service warranty income method is not available to a taxpayer unless the taxpayer uses the proper method of accounting for amounts paid or incurred for insurance costs that cover the taxpayer's risks under the EWAs. This method of accounting is set out in Rev. Proc. 92-97, 1992-2 C.B. 510. Rev. Proc. 92-97 requires that lump-sum amounts paid in advance for multi-year insurance policies to insure the dealer's obligations under the EWA be capitalized and prorated or amortized over the life of the insurance policy.[4]
 
 
 10
 During the relevant years, taxpayers reported as income in the year of receipt the difference between the amount received from the purchase of EWAs and the amount paid to Western General. The remaining proceeds from the sale of EWAs (as increased by an interest equivalent factor) were included in income ratably over the terms of the EWAs. Taxpayers treated the proceeds from the sale of EWAs as having been received on the first day of the taxable year in which the EWA was sold.
 
 
 11
 Taxpayers took deductions for the amounts paid to Western General by capitalizing the payments and amortizing them using an accounting convention under which the premium payment and policy inception were deemed to have occurred on the first day of the taxable year in which the policy was obtained, without regard to the actual date of payment and policy inception. This caused the first year's amortization deduction, as well as each succeeding year's amortization deduction, to match the ratable portion of the deferred EWA income required to be included pursuant to the terms of Rev. Proc. 92-98. As a result, the net income recognized by taxpayers consisted only of the excess of the aggregate EWA prices charged to their customers over the aggregate premiums they paid to Western General in the year of inception, plus the imputed income represented by the interest-equivalent factor in each of the years of the contract term.
 
 
 12
 The Commissioner determined that taxpayers incorrectly computed their deduction for insurance costs in the year a policy was purchased by taking a full year's worth of amortization rather than amortization measured from the actual date of the policy's inception and payment of the premium. Taxpayers filed petitions challenging the recomputed amortization deductions, and contending that the convention which deems qualified advance payment amounts as having been received on the first day of the taxable year should also apply for amortization of insurance expense. The tax court upheld the deficiencies, and taxpayers timely appealed.
 
 II.
 A.
 
 13
 Taxpayers and the Commissioner diverge somewhat in their view of the appropriate standard of review, with taxpayers arguing that we should apply a de novo standard and the Commissioner contending that his determination must be upheld unless clearly unlawful or arbitrary. To the extent there is disagreement, we need not resolve it because we would uphold the Tax Court's decision under either standard.
 
 
 14
 There is no dispute that the Commissioner has broad discretion in determining whether a chosen accounting method clearly reflects income. See Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 533 (1979). However, his discretion may not be arbitrary. Id.; see also Jim Turin & Sons, Inc. v. Commissioner, 219 F.3d 1103, 1105 (9th Cir. 2000).
 
 B.
 
 15
 Taxpayers maintain that the Commissioner abused his discretion by requiring them to change from a method of accounting that clearly reflects income to one that materially distorts income. But as the Tax Court pointed out, the Commissioner administratively established in Rev. Proc. 92-98 a method of accounting for certain prepaid services income of accrual basis taxpayers engaged in the sale of multi-year service warranty contracts for which third-party insurance is obtained. Taxpayers elected this method, which permits deferral of a portion of the prepaid service income equal to the amount which is paid over to a third party to assume the risk under the warranty contracts. Having done so, taxpayers could not ignore Rev. Proc. 92-98's prescribed method of accounting for the insurance expense associated with the warranty contracts set out in Rev. Proc. 92-97. Rev. Proc. 92-97 requires taxpayers to take a proportionate deduction in the year the policy was sold. We agree with the Tax Court's conclusion that taxpayers may not avail themselves of the benefits of deferral provided by Rev. Proc. 92-98 without adhering to its conditions as well.
 
 
 16
 The effect is not to force a change from an accounting method which clearly reflects income to an alternate method that does not, as taxpayers contend. They could instead have chosen to include the entire proceeds from EWA sales in income in the year of receipt. They submit that it is unfair to treat the recognition of service warranty income and the corresponding deduction inconsistently, and to apply an accounting method that fails to match income with expenses. Yet matching of income and related expense does not necessarily result in a clear reflection of income for tax purposes. "[A] taxpayer must recognize prepaid income when received, even though this would mismatch expenses and revenues in contravention of `generally accepted commercial accounting principles.' " Thor Power Tool Co., 439 U.S. at 541 (quoting American Automobile Ass'n v. United States, 367 U.S. 687 (1961)). Further, as the Tax Court noted, without the benefit of Rev. Proc. 92-98, taxpayers would have been obliged to recognize the qualified advance payment to the third-party insurer in the year of receipt. This would yield an even greater mismatch of extended warranty income and associated insurance expense. Put differently, we are not persuaded that it is arbitrary or unlawful for the Commissioner to allow taxpayers favorable deferral of income, as Rev. Proc. 92-98 does, without at the same time accelerating deductions more than they already are.
 
 
 17
 Taxpayers emphasize that their matching position is consistent with that of the Eighth Circuit in Johnson v. Commissioner, 184 F.3d 786, 789 (8th Cir. 1999), aff'g in part and rev'g in part 108 T.C. 448 (1997). It may be, but the decision of the Tax Court is not inconsistent with Johnson because the court there was not considering either Rev. Proc. 92-98 and Rev. Proc. 92-97, or the timing of amortization deductions for payments to third-party insurers.
 
 III.
 
 18
 Taxpayers argue that the Tax Court erred by refusing to consider the issue of whether the amounts remitted to Western General are income to them. They do not seriously quarrel with the Tax Court's view that the issue was not raised in their petitions; it clearly was not. Their petitions complained only about the timing of the deductions, not whether the amounts paid to Western General should be included in income. Tax Ct. Rule 34(b)(4) provides that "[a]ny issue not raised in the assignments of error shall be deemed to be conceded." The Tax Court was entitled to apply its rule to taxpayers' argument.
 
 
 19
 They nevertheless suggest that the issue was adequately raised in their trial memorandum and that in any event, whether the amounts remitted to the third-party insurer are income is material to the issue of whether the Commissioner abused his discretion by requiring them to switch from a method of accounting that clearly reflects income to a method that materially distorts income. As we have explained, we disagree that this is the effect of the Commissioner's determination. Regardless, even though taxpayers did mention "phantom income" in their trial memorandum, they also stipulated that "the remaining EWA amount (that paid to Western General), increased by an interest-equivalent factor, was also properly included in income over the term of the EWA in accordance with Rev. Proc. 92-98." We cannot say that the Tax Court improperly relied on this concession. Accordingly, the issue is foreclosed.
 
 
 20
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 Each taxpayer filed Tax Court petitions January 22, 1996, that were consolidated for trial, briefing, and opinion. The Tax Court entered final decisions determining income tax deficiencies against all taxpayers February 9, 2000, and timely notices of appeal were filed by each. This court, in turn, consolidated the appeals for disposition.
 
 
 [2]
 We take the facts, which are undisputed, from the Tax Court's recitation.
 
 
 [3]
 Rev. Proc. 92-98 was superseded by Rev. Proc. 97-38, 1997-2 C.B. 479, for tax years ending on or after August 18, 1997; however, the service warranty income method described in it is the same method described in Rev. Proc. 92-98. 1997-2 C.B. at 479.
 
 
 [4]
 Rev. Proc. 92-97 provides:
 If a taxpayer purchases a multi-year service warranty insurance policy in connection with its sale of multi-year service warranty contracts to customers by paying a lump-sum premium in advance, the taxpayer must capitalize the amount paid or incurred and may only obtain deductions for the amount by prorating or amortizing it over the life of the insurance policy (whether the cash or accrual method of accounting is used to account for service warranty transactions).
 Rev. Proc. 92-97 was superseded by Rev. Proc. 97-37, 1997-2 C.B. 455, for tax years ending on or after August 18, 1997 and Rev. Proc. 97-37 was superseded by Rev. Proc. 98-60, 1998-2 C.B. 761. However, both Rev. Proc. 97-37 and Rev. Proc. 98-60 also require amortization of a multi-year service warranty insurance policy over the life of the policy. 1997-2 C.B. at 474; 1998-2 C.B. at 780.